**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**DIAMONDBACK FIREARMS, LLC,**

      **Plaintiff,**

**-vs-**                                       **Case No. 6:10-cv-1664-Orl-28DAB**

**SAEILO, INC., d/b/a KAHR ARMS, and**
**KOOK JIN MOON,**

      **Defendants.**
_____

## ORDER

In this suit involving validity and infringement of a patent, Plaintiff, Diamondback Firearms, Inc. ("Diamondback"), has requested pretrial claim construction by the Court. After considering the parties' filings and hearing argument of counsel,[1] the Court rejects Diamondback's proposed claim interpretation.

### I. Background

The patent at issue—U.S. Patent No. 5,502,914 ("the '914 Patent")—pertains to a striker cocking and firing mechanism for a handgun. The patent application was filed on June 25, 1993, and the '914 Patent issued on April 2, 1996. In September 2010, Defendants sent a letter to Diamondback asserting ownership of the '914 Patent and asking that

---

[1] The Court heard oral argument on these motions on March 1, 2012. (See Mins., Doc. 53).

Diamondback show how a series of Diamondback's pistols did not fall within the '914 Patent's scope. (Letter, Ex. 2 to Doc. 20). Diamondback then filed this lawsuit on November 9, 2010, (Doc. 1); in its Amended Complaint (Doc. 20), Diamondback seeks a declaratory judgment of noninfringement and invalidity of the '914 Patent.

Diamondback's Markman[2] motion (Doc. 28) is currently before the Court. In that motion, Diamondback requests construction of the term "half-cocked position," which appears in several claims of the '914 Patent. Defendants object to Diamondback's proposed construction of the term.[3]

## II. Claim Construction Principles

Claim construction is an issue of law for the Court to decide. Markman, 52 F.3d at 970-71. Claim terms "'are generally given their ordinary and customary meaning,'" and such meaning is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." Phillips v. AWH Corp., 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (quoting Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996)).

In construing claims, courts primarily examine the intrinsic evidence to define the patented invention's scope; this intrinsic evidence includes the claims themselves, the

---

[2]Markman v. Westview Instruments, Inc., 52 F.3d 967 (Fed. Cir. 1995) (en banc), aff'd, 517 U.S. 370 (1996).

[3]Initially, Defendants also objected to the Markman motion as premature, asserting that discovery was incomplete. (See Doc. 34 at 3-5). However, the day before the hearing on the Markman motion, Defendants stated that they were no longer objecting to proceeding with the motion absent further discovery. (See Mins., Doc. 52).

patent's specification, and the prosecution history. Id. at 1313-14; C.R. Bard, Inc. v. U.S. Surgical Corp., 388 F.3d 858, 861 (Fed. Cir. 2004). "A claim in a patent provides the metes and bounds of the right which the patent confers on the patentee to exclude others from making, using or selling the protected invention." Corning Glass Works v. Sumitomo Elec. U.S.A., Inc., 868 F.2d 1251, 1257 (Fed. Cir. 1989); accord Phillips, 415 F.3d at 1312 ("It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." (internal citation and quotation omitted)). "[T]he claims themselves provide substantial guidance as to the meaning of particular claim terms." Phillips, 415 F.3d at 1314.

The claims "do not stand alone," however; instead, "they are a part of 'a fully integrated written instrument' consisting principally of a specification that concludes with the claims." Id. at 1315 (quoting Markman, 52 F.3d at 978). Thus, "claims 'must be read in view of the specification, of which they are a part.'" Id. (quoting Markman, 52 F.3d at 979). While "'the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims.'" Comark Commc'ns, Inc. v. Harris Corp., 156 F.3d 1182, 1187 (Fed Cir. 1998) (quoting Constant v. Advanced Micro-Devices, Inc., 848 F.2d 1560, 1571 (Fed. Cir. 1998)).

The prosecution history is another component of the intrinsic evidence used to supply the proper context for claim construction. Home Diagnostics, Inc. v. LifeScan, Inc., 381 F.3d 1352, 1356 (Fed. Cir. 2004). This history "consists of the complete record of the proceedings before the [Patent and Trademark Office] and includes the prior art cited during the

examination of the patent." Phillips, 415 F.3d at 1317. Although the prosecution history "provides evidence of how the PTO and the inventor understood the patent, . . . it often lacks the clarity of the specification and thus is less useful for claim construction purposes." Id. The history can, however, indicate the inventor's understanding of the invention and "whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." Id.

In addition to intrinsic evidence, courts may also rely on extrinsic evidence, which "consists of all evidence external to the patent and prosecution history," Markman, 52 F.3d at 980; however, extrinsic evidence is "'less significant than the intrinsic record in determining the legally operative meaning of claim language.'" Phillips, 415 F.3d at 1317 (quoting C.R. Bard, 388 F.3d at 862) (further internal quotation omitted). Such evidence typically includes dictionaries, treatises, and testimony of the inventor or experts. Markman, 52 F.3d at 980.

Technical dictionaries and treatises may help a court understand the underlying technology and the manner in which one of skill in the art might use the claim terms, but technical dictionaries and treatises may provide definitions that are too broad or that may not be indicative of how the term is used in the patent. Phillips, 415 F.3d at 1318. Similarly, expert testimony may aid a court in understanding the underlying technology and determining the particular meaning of a term in the pertinent field, but an expert's conclusory, unsupported assertions as to a term's definition are entirely unhelpful to a court. Id. Therefore, "a court should discount any expert testimony that is clearly at odds with the claim construction mandated by the claims themselves, the written description and the prosecution history, in other words, with the written record of the patent." Id. (internal citation and

quotation omitted). Overall, extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms," and it is "unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." Id. at 1318-19.

### III. Analysis

The term at issue—"half-cocked position"—pertains to one of several described positions of the striker in a firearm that includes the striker cocking and firing mechanism that is the claimed invention of the '914 Patent. Such a firearm is generally described in the "Summary of the Invention" portion of the specification of the '914 Patent as "featuring a mechanism, which includes a trigger attached to a trigger bar which operates a cocking and releasing element to move a striker rearwardly of the hand gun to a fully-cocked position and release the striker to move forwardly of the hand gun, under spring pressure, to thrust through the hole in the breech face of the hand gun in order to detonate a loaded cartridge primer." ('914 Patent col. 2 ll.16-22).

The '914 Patent contains fifteen claims, and the term "half-cocked position" appears in all of the asserted claims.[4] For example, Claim 1 of the Patent provides in part:

> . . . said striker being moveable into engagement with said cocking and releasing element in said first position and to a **half-cocked position** intermediate said fully-cocked position and said striking position in response to movement of said slide from said retracted position toward said forward position, said cocking and releasing element in said first position maintaining said striker in said **half-cocked position**, said striker being moveable from said **half-cocked position** to said fully-cocked position and releasable from said fully-cocked position for movement to said striking position in response to

---

[4](See Doc. 28 at 7).

movement of said trigger to said firing position . . .

('914 Patent col.4 l.65-col.5 l.9) (emphasis added).[5]

In its Markman motion, Diamondback argues that "half-cocked position" should be construed as "midpoint position of the travel of the striker, with partial striker spring compression." (See Doc. 28 at 7). Defendants object that both the "midpoint position of the travel of the striker" and "with partial striker spring compression" components of this

---

[5]In full, Claim 1 provides:
   What is claimed is:
   1. A firearm comprising a frame defining a receiver, a slide supported for reciprocal sliding movement on and relative to the frame between forward and retracted positions, and a firing mechanism for discharging said firearm and including a striker supported by the slide for movement with the slide and relative to the frame and for movement relative to the slide between a fully-cocked position and a striking position, said striking position corresponding to the discharging position of said firearm, first biasing means for urging said striker toward said striking position, a cocking and releasing element supported on the frame within the receiver for movement between first and second positions, second biasing means for urging said cocking and releasing element towards its first position, a trigger assembly for engaging and moving said cocking and releasing element from its first to its second position and including a trigger moveable from an inactive position to a firing position, said striker being moveable into engagement with said cocking and releasing element in said first position and to a **half-cocked position** intermediate said fully-cocked position and said striking position in response to movement of said slide from said retracted position toward said forward position, said cocking and releasing element in said first position maintaining said striker in said **half-cocked position**, said striker being moveable from said **half-cocked position** to said fully-cocked position and releasable from said fully-cocked position for movement to said striking position in response to movement of said trigger to said firing position, and disconnecting means for disengaging said trigger assembly from said cocking and releasing element after said striker has been released by said cocking and releasing element and in response to movement of said slide to said retracted position.

('914 Patent col.4 l.49-col.5 l.14).

proposed construction improperly read limitations into the claim. Defendants' objections are well-taken. The two portions of Diamondback's proposed construction are addressed in turn.

A. "Midpoint Position of the Travel of the Striker"

In arguing that the "half-cocked position" should be construed in part as the "midpoint position of the travel of the striker," Diamondback asserts that its "proposed definition is straightforward on its face" and that "half means half." (Doc. 28 at 10). However, as correctly noted by Defendants, Diamondback's approach of dividing the term into two parts, isolating "half," and then urging the everyday literal meaning of "half" ignores the historical use of the term "half-cocked" in the firearms industry. Diamondback has not presented any persuasive evidence that the "half-cocked position" described in the '914 Patent requires that the striker be at the midpoint position of its travel, and the historical use of the term in the firearms industry has not included such a midpoint limitation. Accordingly, the term will not be interpreted as such.

As earlier noted, claim terms "'are generally given their ordinary and customary meaning,'" but that meaning is "the meaning that the term would have to a person of ordinary skill in the art." Phillips, 415 F.3d at 1312-13. Expert testimony can be helpful to a court in determining a term's meaning in the field of the invention, see id. at 1318,[6] and both sides

---

[6]While expert testimony is helpful on the issue of whether a term has a particular meaning in the pertinent field, conclusory expert opinion as to how a claim term should be defined or how the expert would construe the patent is not. See Gen. Protecht Grp., Inc. v. Int'l Trade Comm'n, 619 F.3d 1303, 1310 (Fed. Cir. 2010); Symantec Corp. v. Computer Assocs. Int'l, Inc., 522 F.3d 1279, 1291 (Fed. Cir. 2008). Accordingly, the Court has considered the testimony of the experts in determining term usage in the art but has not considered conclusory opinions of the experts or other witnesses as to what the patent terms or claims mean.

have submitted expert declarations regarding the meaning of "half-cocked position" in the firearms industry.

Diamondback's expert, John Nixon, opines in his declaration that "half-cocked position" requires that the striker be in its midpoint position, but he provides absolutely no basis for this conclusion even though he does give explanations for other terms—including "cocked" and "uncocked"—on which he expresses opinions. (See Nixon Decl., Ex. C to Doc. 28). Such a conclusory assertion regarding a "midpoint position" interpretation is not persuasive evidence. See Phillips, 415 F.3d at 1318 (noting that "conclusory, unsupported assertions by experts as to the definition of a claim term are not useful to a court").

On the other hand, Defendants' two experts do explain that "half-cocked" has historical meaning within the firearms industry and that "half" has never been understood as meaning the actual "half" or "midpoint" of the striker or any other gun feature. One of Defendants' experts, J.B. Wood, explains that the term "half-cocked position" "goes all the way back to the days of the flintlock firearm" when "[t]here was a separate step, or notch, on the external hammer that held it in position with the flint slightly away from the [striking plate] and provided room for the [striking plate] to be tipped open for addition of the priming powder charge." (Wood Decl., Ex. B to Doc. 34, at 2). "By measurement definition, this was not a true 'half-cock,' as the hammer was pivoted only a little more than one-third of its 'full-cock' arc." (Id.).

Wood further explains that in early semi-automatic pistol designs "the great John Moses Browning was concerned about the possibility of the user's thumb slipping off when cocking an external hammer." (Id.). Out of this concern, Browning "added an intermediate

step, or notch, to catch the hammer and prevent firing pin contact" and "called it 'half-cock.'" (Id.). "In actual position-measurement it wasn't at all half of cocked and specifying the location in the travel of the hammer was not the purpose of the term." (Id.).

According to Wood, "the term 'half-cock' is not related to the actual position of the hammer or striker in firearm usage." (Id. at 2-3). Instead, it is "an established firearms term that refers generally to a position of either the hammer or striker between the uncocked/firing position and the fully cocked position where they are not in contact with the primer of a cartridge in the chamber." (Id. at 3). "It is not comparable to an engineering type measurement which refers to a specific location in the travel of either the hammer or striker. It is an intermediate position between the firing and fully cocked positions . . . ." (Id.).

The second of Defendants' experts, Seth Bredbury, also recounts in his declaration the history of the term "half-cocked." Bredbury explains that the term "predates the existence of semiautomatic pistols and was applied to a distinct stable hammer position often found in early muzzleloading firearms between the fully cocked and the fully forward position of the hammer." (Bredbury Decl., Defs.' Hr'g Ex. 2 (filed in open court on Mar. 1, 2012), at 3). Furthermore, "[t]here was no requirement or understanding that this half-cock hammer position was precisely halfway between the fully down position and the fully cocked position of the hammer." (Id.).

In sum, Diamondback has presented no persuasive evidence[7] supporting its

---

[7]In addition to the expert declarations, the parties have submitted other extrinsic evidence as to the meaning of "half-cocked." That other evidence goes more to the second portion of Diamondback's proposed claim interpretation regarding striker spring compression than to whether "half" denotes the "midpoint position of the travel of the striker. The Court

contention that "half-cocked position" means that the striker must be at the midpoint of its path of travel. In contrast, Defendants have explained the historical use of the term as not meaning mathematically "half" with regard to striker position, and Defendants' evidence in this regard is credited. "Half-cocked position" will not be construed as requiring that striker be in the midpoint position of its travel as urged by Diamondback.

### B. "With Partial Striker Spring Compression"

Diamondback additionally argues that "half-cocked position" should be construed as including the limitation "with partial striker spring compression." However, Diamondback has not established that the ordinary and customary meaning of "half-cocked" requires partial striker spring compression. Neither the claims, the specification, the prosecution history, nor extrinsic evidence supports construing the term in this manner, and thus the second portion of Diamondback's proposed construction is also rejected.

Defendants persuasively argue that the evidence does not support a finding that "half-cocked position" as used in the firearms industry necessarily has any reference to spring compression, and thus there is not an established specialized meaning that includes spring compression that can be imported into the claim. As earlier noted, Defendants' experts have explained that "half-cocked" originated as a safety feature on hammer-fired firearms, and they further note that the term historically means an intermediate position between the uncocked position and the fully-cocked position where the hammer or striker is not in contact with the primer and there is insufficient energy for the weapon to accidentally discharge.

---

has not overlooked that evidence in assessing the "midpoint" issue, but none of that evidence alters the conclusion in the text that "half" in "half-cocked" does not mean "midpoint."

-10-

(See Wood Decl. at 3-4; Bredbury Decl. at 3).  Both of these experts also state that as commonly understood, "half-cocked" has no reference to spring tension or compression and does not require such tension or compression.  (See Wood Decl. at 3; Bredbury Decl. at 3).

Additionally, Bredbury opines that as the term applies to a striker-fired handgun there is "no one specific meaning" of "half-cocked" with regard to parts of a firing mechanism because "there are many types of striker fired firing mechanisms."  (Bredbury Decl. at 3). Bredbury explains that "some striker fired handguns have no separate stable half-cock position" and that "[i]t would be necessary to examine the particular handgun . . . to determine the detailed characteristics of the mechanism when it is in half-cock position" to determine what was meant.  (Id.).  Moreover, although Diamondback's expert does not specifically discuss "half-cocked position" other than giving his bare opinion about what it means in the '914 Patent, he does refer to variations among guns with regard to the uncocked position—some guns have spring tension even in the uncocked position, while others do not—as well as with regard to the cocked position and "battery" position, which he explains "typically means the ready-to-fire position."  (Nixon Decl. at 3-4).  Thus, the testimony of both parties' experts makes clear that there is much variation in gun designs and use of terminology pertaining to cocking positions.  (See, e.g., id. at 4 (stating that "[t]he location of component parts in the battery position is different depending on the specific handgun of interest, and the design of the gun determines whether the handgun is cocked, partially cocked or uncocked in the battery position")).

Other evidence presented by the parties also falls short of demonstrating an established requirement of partial striker spring compression in a handgun in the "half-cocked

-11-

position." Diamondback has submitted an instruction manual on a Glock gun and patents on two other manufacturers' guns. The Glock gun manual, in describing that weapon's function, states that after the weapon is cocked by racking the slide, the "weapon is now half-cocked, i.e., firing pin spring half tensioned . . . ." (Ex. H to Doc. 28, at 11). The first of the other gun patents—a Smith & Wesson—describes some prior art pistols as having "the firing pin . . . quite strongly preloaded or tensioned in an intermediate or semi-cocked position." (Ex. I to Doc. 28, at 8). The other firearm patent, by Felk, states in part: "According to this invention the ready position for the firing mechanism is such that there is no compression of the propelling spring, therefore it is impossible for the pistol to discharge if the pistol is dropped. In other words, the ready position of the pistol is the uncocked condition." (Ex. J to Doc. 28, at 6).

Defendants have submitted an excerpt from American Rifleman magazine describing the operation of a Glock pistol and a definition from Dyer Scientific and Technical Translations.[8] The magazine excerpt states in part that when the slide on the Glock gun is retracted and released, "the firing pin . . . is partially held back ('half-cocked') by the cruciform sear plate on the rear of the trigger bar," which "does several things," including "keep[ing] the firing pin from primer contact . . . and shorten[ing] the necessary final movement of cocking

---

[8]Defendants also submitted a definition of "half-cock" from Wikipedia that provides in part that "[h]alf-cock is a technical firearms term referring to the position of the hammer where the hammer is partially but not completely cocked." (Ex. E to Doc. 34). As announced at the Markman hearing, however, the Court declines to rely on Wikipedia in addressing claim construction. Additionally, Defendants submitted the declaration of a patent attorney in support of its claim construction arguments, but Diamondback's motion to strike that declaration was granted by prior Order. (See Docs. 36 & 44 (striking Ex. F to Doc. 34)).

of the firing pin by trigger depression when discharge is wanted." (Ex. C to Doc. 34). The Dyer Scientific and Technical Translations definition of "half-cock" is "[h]ammer position, held away from the primer but with not enough spring compression to fire the primer if the hammer should fall." (Ex. D to Doc. 34).

This additional extrinsic evidence submitted by the parties tends to show a lack of established industry standards on many features of guns—including partial spring compression in the half-cocked position—and confirms that, as stated by the experts, gun designs and terminology usage in the industry vary. Thus, any basis for a requirement of such partial spring compression with regard to the meaning of "half-cocked position" in the claims of the '914 Patent must come, if at all, from the intrinsic evidence. As set forth below, the intrinsic evidence does not support such a requirement.

Diamondback argues that the plain meaning of "cocking" supports its proposed spring pressure limitation, and Diamondback relies on language in the claims and in the specification to support its contention. Diamondback maintains that "cocking" a firearm means "to drive the striker rearwardly" so that enough energy is stored in the striker spring to allow the striker to impact the primer. (Doc. 28 at 10 (citing '914 Patent col.1 ll.28-34 & col.3 ll. 22-28)).[9]

The "Detailed Description of the Preferred Embodiment" portion of the patent explains how the striker is moved from the uncocked to the half-cocked position as follows:

---

[9]Both of these portions of the patent discuss what occurs after the trigger is pulled—when the striker is moving from the half-cocked position to the fully-cocked position and then to the fired position.

-13-

> As the cycle of operation proceeds from the uncocked position, the elements of the firing mechanism of this invention move to the half-cocked position as the slide is pulled back to its retracted position and then released. This pulling and releasing action of [the] slide loads a cartridge into the firing chamber and positions the tongue of [the] striker behind the first cam lobe of [the cocking] cam. In the half-cocked position, the striker does not possess, in theory, enough energy to detonate the primer if it releases at that point.

('914 Patent col.3 ll.7-17 (references to patent drawings and part numbers removed)). Diamondback relies heavily on this description of the striker not having "in theory, enough energy" when in the half-cocked position to detonate the primer if released, focusing on both "enough energy" and "if it releases." However, neither of these terms supports a requirement of partial striker spring compression.

Diamondback contends that the reference to "not enough energy" means that in the half-cocked position the striker possesses energy due to striker spring compression. However, Defendants note that a striker that has no force exerted on it by the striker spring will also not possess "enough energy" to fire the gun, and Defendants clarify that they do not suggest that the striker cannot have partial spring compression in the half-cocked position but only that it need not have such compression. With regard to "if it releases," Diamondback argues that if there is no spring pressure there can be no "release." Defendants respond that the striker is being held by the cocking cam when it is in the half-cocked position, and thus it may be "released" from the half-cocked position by the cocking cam regardless of whether there is spring pressure. This patent language does not compel the conclusion sought by Diamondback.

Faced with a lack of any reference to striker spring compression in the claims,

Diamondback attempts to rely on claim language referring to the striker being "moveable into engagement with" the cocking cam and also the cocking cam engaging the tongue of the striker and "maintain[ing]" the striker in the half-cocked position. (Doc. 28 at 13 (citing Claim 1)). Diamondback argues that "engage" and "maintain" are "active words" that show that the striker is under spring pressure and therefore must be "maintained" in that position by the cam. However, this contention is not persuasive; the Court cannot conclude from the use of such arguably "active" words that striker spring pressure exists.

Diamondback also cites references to the "second biasing means" in the claim and in the preferred embodiment; this second biasing means is not the striker spring but another spring that moves the cocking cam. Diamondback notes references in the preferred embodiment to this spring and the striker spring exerting force on the cam. (Doc. 28 at 14 (citing '914 Patent col.4 ll.23-27)). Defendants explain in response that the patent does not require the springs to apply force to either the cam or the striker when in the half-cocked position. Diamondback has not persuaded the Court that this portion of the preferred embodiment—which is discussing a safety feature of the gun and refers to force on the cam rather than the striker—can be read as a "striker spring compression" limitation on the term "half-cocked position."

Diamondback also relies in its motion—as it did extensively at oral argument—on the drawn figures of the patent, asserting that the striker spring depicted in the half-cocked position is more compressed than in the uncocked position and still more compressed in its fully-cocked position than in its half-cocked position. While the drawings as a whole are very helpful in understanding the operation of the invention, the Court cannot rely on the drawings

to read this limitation into claim language. See Hockerson-Halberstadt, Inc. v. Avia Grp. Int'l, Inc., 222 F.3d 951, 956 (Fed. Cir. 2000) ("The . . . patent is devoid of any indication that the proportions of [the drawn features] are drawn to scale. . . . Under our precedent, it is well established that patent drawings do not define the precise proportions of the elements and may not be relied on to show particular sizes if the specification is completely silent on the issue.").[10]

Diamondback also relies on the prosecution history, arguing that the original application did not use the term "half-cocked" in the claims and that the addition of that term in a later amendment must be meaningful. However, the claims changed significantly during the prosecution of the patent for various reasons, and Diamondback has not identified any evidence that "half-cocked position" was added in order to overcome a rejection having to do with spring compression, nor has Diamondback otherwise explained how the addition of "half-cocked position" means that striker spring compression is required. Diamondback also notes that in the original patent application the inventor used "battery position" and "half-cocked position" as meaning the same thing. (Doc. 28 at 16 (citing Ex. B to Doc. 28)). However, this does not establish a "partial striker spring compression" limitation. And, as explained by Diamondback's expert, "[t]he location of component parts in the battery position is different depending on the specific handgun of interest, and the design of the gun determines whether the handgun is cocked, partially cocked or uncocked in the battery

---

[10]In relying on the drawings, Diamondback acknowledges—despite its "midpoint" argument previously addressed—that "the half-cocked position illustrated in Figure 4 is approximately 60%"—not 50%—"of the travel of the striker." (Doc. 28 at 15 n.9).

-16-

position." (Nixon Decl. ¶ 7). Diamondback has not shown that the inventor limited the claim scope during prosecution by adding the word "half-cocked position" or by removing reference to the "battery position."

As another part of its prosecution history argument, Diamondback relies on the fact that the inventor submitted a brochure for the Kahr K9 pistol during patent prosecution—at the same time that the "half-cocked position" language was added to the claim language. Diamondback argues that this pistol has spring compression in its half-cocked position and accordingly requires that the patent be construed as requiring such compression. However, in making this argument Diamondback correctly refers to the K9 pistol as "an embodiment" of the invention, and Diamondback has presented no legal support for narrowing the scope of claims based on submission of an advertising brochure depicting an embodiment of an invention.

Diamondback also argues that the "half-cocked position" must be given some meaning because the claim already includes the limitation "intermediate said fully-cocked position and said striking position," which itself requires that the striker be moved between the striking and fully-cocked positions. Diamondback contends that unless a meaning is assigned to "half-cocked" beyond a striker position that is already covered by the "intermediate" phrase that follows it, a redundancy in the claim language would result and the term "half-cocked" would in essence be eliminated completely, violating the canon that all claim limitations must be considered meaningful. Diamondback claims that "half-cocked" "suggests energy imparted to the striker—compression at the spring," (Doc. 28 at 11), and Diamondback avers that because the patent describes the "uncocked" state as "at rest," then the "cocked" component

of "half-cocked" must indicate spring pressure or there would be no meaningful distinction between the uncocked and half-cocked positions.

Diamondback's arguments in this regard are without merit. As discussed earlier, there is variation in the firearms industry as to how terms are used, even according to Plaintiff's expert. Failure to assign a definition to "half-cocked position" would not render it merely redundant to "intermediate said fully-cocked position and said striking position." The inventor is describing where, on this gun, the half-cocked position is, and the half-cocked position is distinguished from the uncocked position not only by its relative location but also by engagement of the striker tongue with the cocking cam. No redundancy or meaninglessness results from not defining "half-cocked position" beyond how it is already defined by the claim language itself.

In sum, Diamondback has not established a basis for requiring that "half-cocked position" as used in the claims of the '914 Patent requires "partial striker spring compression." And, because "only those terms need be construed that are in controversy, and only to the extent necessary to resolve the controversy," Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc., 200 F.3d 795, 803 (Fed. Cir. 1999), the Court will stop its analysis at rejection of Diamondback's proposed constructions and will not impose a definition that has not been proposed or shown to be necessary to resolve an underlying issue in the case.[11]

### IV. Conclusion

In accordance with the foregoing, it is **ORDERED** and **ADJUDGED** that the proposed

---

[11]Defendants have not put forth a formal proposed construction of "half-cocked position."

claim interpretation in the Motion for Claim Construction (Doc. 28) filed by Plaintiff is **rejected** and the motion is **DENIED**.

**DONE** and **ORDERED** in Orlando, Florida this 28th day of September, 2012.

_____
JOHN ANTOON II
United States District Judge

Copies to:
Counsel of Record