**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**DIAMONDBACK FIREARMS, LLC,**

      **Plaintiff,**

**-vs-**                                                 **Case No. 6:10-cv-1664-Orl-28DAB**

**SAEILO, INC., and KOOK JIN MOON,**

      **Defendants.**

_____

# ORDER

This patent infringement controversy involves firing mechanisms for handguns. Plaintiff, Diamondback Firearms, LLC ("Diamondback"), filed this suit against Defendants seeking a declaratory judgment that a handgun that it manufactures does not infringe U.S. Patent No. 5,502,914 ("the '914 Patent"), which is assigned to Defendants. The case is currently before the Court on Diamondback's Motion for Summary Judgment as to Noninfringement (Doc. 74). Having considered the parties' submissions,[1] the Court concludes that Diamondback's motion must be denied.

## I. Background

The '914 Patent, titled "Striker Cocking and Firing Mechanism for a Handgun," issued on April 2, 1996. The general operation of a firearm including the patented mechanism is explained in the specification of the '914 Patent, which describes a handgun that includes

---

[1] The pertinent filings are Diamondback's Motion for Summary Judgment as to Noninfringement (Doc. 74), Defendants' Response in Opposition (Doc. 91) thereto, and Diamondback's Reply (Doc. 93).

a "trigger attached to a trigger bar which operates a cocking and releasing element"—also referred to as a cam—that moves the striker from a "half-cocked position" to a "fully-cocked position" and then releases the striker so that the striker moves forward under spring pressure to detonate a loaded cartridge primer.  ('914 Patent col.2 ll.16-22).

In 2007, two Diamondback[2] employees began designing a .380-caliber pistol called the DB380.  It is undisputed that in October 2007, Diamondback obtained one of Defendants' guns and learned of the '914 Patent. (See Thomas Dep., App. A to Doc. 91, at 123).  There is evidence that at that point, Diamondback became concerned about infringing the '914 Patent and attempted to design around its striker system so as not to infringe. (See id. at 120; Horan Dep., App. D to Doc. 91, at 28).  Essentially, the question presented by this case is whether efforts to do so were successful.

In September 2010, Defendants sent a letter to Diamondback asserting ownership of the '914 Patent and asking that Diamondback show how Diamondback's 380 series of pistols did not fall within the '914 Patent's scope. (Letter, Ex. 2 to Doc. 20).  Diamondback then filed this lawsuit on November 9, 2010, (Doc. 1); in its Amended Complaint (Doc. 20), Diamondback seeks a declaratory judgment of noninfringement and invalidity of the '914 Patent.  Diamondback's motion for summary judgment as to noninfringement is now before the Court.[3]

---

[2]There are several Diamondback corporate entities, but the distinction between them is not significant for the purposes of this Order; sometimes the entities are referred to collectively herein as "Diamondback."

[3]Diamondback has also filed a Motion for Summary Judgment as to Invalidity (Doc. 75).  That motion will be addressed in a separate Order.

## II.  Summary Judgment Standards

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In patent cases, "[s]ummary judgment on the issue of infringement [or non-infringement] is proper when no reasonable jury could find that every limitation recited in a properly construed claim either is or is not found in the accused device either literally or under the doctrine of equivalents."  PC Connector Solutions LLC v. SmartDisk Corp., 406 F.3d 1359, 1364 (Fed. Cir. 2005).  Thus, Diamondback, as the accused infringer and the moving party, "is entitled to summary judgment of no infringement only if the facts and inferences, when viewed in the light most favorable to [Defendants], would not persuade a reasonable jury to return a verdict in favor of [Defendants], the non-moving party." Bus. Objects, S.A. v. Microstrategy, Inc., 393 F.3d 1366, 1371-72 (Fed. Cir. 2005) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)).

## III.  Discussion

"A court determines patent infringement by construing the claims and then applying that construction to the accused process or product." Bus. Objects, 393 F.3d at 1371. These steps are addressed in turn.

### A.  Claim Construction

Earlier in this suit, Diamondback filed a Markman[4] motion requesting construction of the claim term "half-cocked position," arguing that this term should be defined as "midpoint

---

[4]Markman v. Westview Instruments, Inc., 52 F.3d 967 (Fed. Cir. 1995) (en banc), aff'd, 517 U.S. 370 (1996).

position of the travel of the striker, with partial striker spring compression." (Doc. 28). However, the Court rejected both components of Diamondback's proposed construction and declined to limit this term as requiring that the striker be in the midpoint position of its travel or as requiring any striker spring compression. (See Order, Doc. 107).

### B. Application to the Accused Product

#### 1. What is the Accused Product?

In their summary judgment filings, the parties dispute what the accused infringing product is, and this point warrants clarification. In its motion, Diamondback requests a finding that the asserted claims of the '914 Patent "are not infringed by the 'Zero-Energy' Striker System used in the DB380." (Doc. 74 at 9; see also id. passim). In their Response, Defendants assert that "[t]he accused product in this case is the DB380 handgun manufactured and distributed by [Diamondback], not the 'zero energy striker' component described by [Diamondback] in its motion." (Doc. 91 at 2). Defendants further state that they want "no inference that [they] ha[ve] allowed the identity of the accused products to change in this proceeding beyond the DB380 described in [Diamondback]'s complaint or that any additional issues or products have been submitted for ruling or trial herein by consent." (Id.). In its Reply, Diamondback insists that its "zero-energy" striker system is the accused product and argues that that striker system does not infringe the '914 Patent. (See Doc. 93).

The accused products at issue are firearms—not the striker system in those firearms. In the pre-litigation letter sent by Defendants to Diamondback, Defendants asked "that Diamondback show how the 380 series of pistols do not fall within the scope of the '914 patent." (Ex. 2 to Doc. 20). Furthermore, Diamondback's Amended Complaint (Doc. 20)

alleges that "[n]o firearm in the DB380 line infringes any claim of the '914 patent." (Am. Compl. ¶ 41). All fifteen of the claims of the '914 Patent claim "a firearm" containing the described components. Thus, in order for a product to infringe it must be a firearm, and obviously a striker system that is not a firearm could not in and of itself infringe any claims because it does not contain the element of being "a firearm." A declaration that the striker system does not infringe would be nonsensical, though of course elements of the striker system could be what causes a firearm to infringe. Diamondback's contention as to its striker system being the accused product is rejected. The accused product is the DB380 line of firearms.

### 2. The Asserted Claims

The '914 Patent contains fifteen claims, and Defendants assert that Diamondback's DB380 series of pistols infringes Claims 1-6, 8, and 12. Diamondback argues that the DB380 series does not infringe any of these claims.

### a. Claims 1 and 12

As noted by Diamondback in its motion, "[t]here is no dispute that many of the elements [of Claims 1 and 12] are present in" Diamondback's accused products. (Doc. 74 at 5). However, the parties dispute whether two elements of Claims 1 and 12 are present in the Diamondback guns.

Claims 1 and 12 both contain the following language:

> said striker being **moveable into engagement** with said cocking and releasing element in said first position and to a half-cocked position intermediate said fully-cocked position and said striking position in response to movement of said slide from said retracted position toward said forward position,

>said cocking and releasing element in said first position **maintaining said striker** in said half-cocked position . . .

('914 Patent col.4 l.65-col.5 l.5 & col.7 l.28-col.8 l.4) (emphasis added). The parties disagree on whether Diamondback's pistols satisfy the "moveable into engagement" and "maintaining said striker" elements highlighted in bold print above.

### i. "moveable into engagement"

Diamondback asserts that its striker system "does not engage the cam" when the cam is in its first position but instead "has float" between the striker and the cocking and releasing cam. (Doc. 74 at 5-6). Defendants respond that Diamondback improperly focuses on "engagement" rather than "moveable into engagement" as set forth in the claim language. Defendants assert that even if the DB380 striker can "float," the DB380 still meets this element because its striker is "moveable into engagement" with the cam. In its Reply, Diamondback contends that according to Defendants' reasoning all striker-fired weapons would satisfy the "moveable into engagement" language.

Defendants have the better argument on this point. This portion of the claim language states that the striker is "moveable into engagement" with the cam, not that it is engaged with the cam. Diamondback's contention regarding all striker-fired weapons satisfying this language misses the mark; many elements of the claim—for example, the slide, frame, and "a trigger moveable from an inactive position to a firing position"—would seemingly also apply to many weapons, but this circumstance does not warrant deviation from the plain claim language. Diamondback does not contest—except under its proposed claim

y

interpretation, which has been rejected[5]—that its DB380 pistols have a striker that is "moveable into engagement" with the cocking and releasing element, and Diamondback has not established entitlement to summary judgment based on this limitation.

### ii. "maintaining said striker"

Diamondback also asserts that the "maintaining said striker" element of Claims 1 and 12 is not met by the DB380. Diamondback contends that the cam in the DB380 does not "maintain" the striker because the striker can float freely. Defendants respond that even though the striker may theoretically "float," the DB380 cam "necessarily prevents the striker from moving to the striking position." (Doc. 91 at 7).

The only evidence that Diamondback submitted with its summary judgment motion is the declaration of Phillip Brady "Brad" Thomas—the CEO of Diamondback and one of the two Diamondback employees involved in the design of the DB380 and the "zero energy" striker system. (Thomas Decl., Ex. A to Doc. 74). Thomas states that when the DB380 is in its "ready to fire" position, "the striker tongue is behind the cocking cam, but the striker is fully forward" and "the cam and striker . . . are not engaged." (Id. ¶¶ 7-8). Thomas explains that the mechanism "is designed to have a small gap" between the cam and the striker and that the free space or "float" allows free movement of the striker in the float space. (Id. ¶ 8). Because of this float, says Thomas, "the cam does not maintain the striker in this position." (Id.). As explained by Thomas, the pulling of the trigger causes the cam to rotate, and this rotation of the cam "causes the cam lobe to engage the tongue of the striker and draw the

---

[5](See Doc. 93 at 2 (arguing that under Diamondback's interpretation of "half-cocked" the DB380 striker is not moveable into a half-cocked position)).

striker rearwardly." (Id. ¶¶ 13-14). In other words, according to Thomas the cam does not engage the tongue of the striker until the trigger is pulled.

In response, Defendants note that Diamondback's motion and Thomas's declaration focus on the "design" of the DB380 and the drawings of that design rather than the way that the DB380 is actually made. Defendants have submitted the depositions of their expert, Seth Bredbury, and of Robert "Bobby" Horan, the second Diamondback employee who, along with Thomas, participated in the design of the DB380 and its parts. Additionally, Defendants have submitted Bredbury's expert report.

In his expert report, Bredbury opines that the Diamondback pistols "operate in a manner identical to that described and claimed in the [asserted claims of] the '914 [P]atent." (Bredbury Report, App. B to Doc. 91, at 16). Bredbury describes the functioning of the firing mechanism described in the '914 Patent and then states that he has examined eight samples of Diamondback's pistols, all of which operated in the same manner as described in the '914 Patent. (Id. at 16-17). Bredbury opines that all elements of every asserted claim are present in the Diamondback products. (Id. at 18-22).

Additionally, in his deposition, Bredbury testified that six of the eight Diamondback guns he tested did not exhibit "float" in the ready-to-fire position as asserted by Diamondback. (Bredbury Dep., App. C to Doc. 91, at 67-72). Three or four of the Diamondback pistols that Bredbury observed were cut-away models, and he could actually see engagement of the tongue of the striker with the cam. (Id. at 70).

Horan was employed by Diamondback[6] from 2006 until 2009 or 2010. (Horan Dep. at 8-11).[7] Thomas and Horan began designing the DB380 in 2007 after Thomas joined Diamondback, and, according to Horan, when his employment ended the guns were already in production, with the first guns being shipped to distributors in November 2008. (Id. at 49-50).[8] Horan explained that the DB380 was designed to have a small space between the striker and the cam, but "[i]t didn't actually get made that way" and the gun is not manufactured the way that the drawings show. (Id. at 64-65). According to Horan, the cam engages the leg of the striker in the ready-to-fire position. (Id. at 37).

In its Reply, Diamondback challenges the tests conducted by Bredbury and characterizes Horan as a "disgruntled" and "biased" former employee. Diamondback asserts that Horan has admitted not knowing anything about the current DB380 on the market, "a product modified after he left Diamondback." (Doc. 93 at 6). Diamondback's challenges to Defendants' evidence cannot, however, be resolved on summary judgment. Moreover, while Diamondback refers to the DB380 as being modified after Horan left Diamondback, Thomas testified in his deposition that no changes have been made to the striker system since the DB380 went into production. (Thomas Dep. at 167).

In short, there is conflicting evidence on the issue of the functioning of the DB380

---

[6] Horan was employed by Diamondback CNC, a Diamondback affiliate.

[7] Horan testified that he worked at Diamondback until January 2009; Thomas testified in his deposition that Horan worked there until January 2010, (Thomas Dep. at 135).

[8] Thomas testified in his deposition that the gun went into production in 2009. (Thomas Dep. at 119).

regarding "maintaining" the striker, and these conflicts cannot be resolved at the summary judgment stage of the case. The Court cannot rely on design drawings and one inventor's testimony to the exclusion of other evidence; resolution of these evidentiary conflicts must be done by the factfinder—the jury.

### b. Claims 2 through 6

Claims 2, 3, 4, 5, and 6 all depend on Claim 1, and Diamondback argues that for the same reason the DB380 does not infringe Claim1, it also does not infringe any of Claims 2 through 6. Because the Court has concluded that Diamondback is not entitled to summary judgment of noninfringement as to Claim 1, the Court necessarily concludes that Diamondback also is not entitled to summary judgment of noninfringement as to Claims 2, 3, 4, 5, or 6.

### c. Claim 8

Like Claims 2 through 6, Claim 8 also depends on Claim 1, and Diamondback asserts that if Claim 1 is not infringed then Claim 8 necessarily also is not infringed. In light of the rulings above regarding Claims 1 through 6, the Court also cannot find that Claim 8 is not infringed based on the alleged noninfringement of Claim 1.

Nevertheless, Diamondback argues an additional reason for a finding of noninfringement of Claim 8, which recites: "A firearm as set forth in claim 1 wherein said f[r]ame has an arresting surface thereon and said cocking and releasing element has an abutment surface for engaging said arresting surface when said cocking and releasing element is in its first position to maintain said cocking and releasing element in its first position." ('914 Patent col. 5 ll.51-56). Diamondback asserts that the frame of its gun does

not have an arresting surface for engaging an abutment surface on the cam but instead has a "rear frame rail"—a separately manufactured component inserted into the frame of the gun—to stop the rotation of the cam.

Defendants respond that on an assembled DB380 gun, the "frame rail" is clearly considered part of the frame.  Additionally, Defendants argue that if the frame rail can be considered a component separate from the frame, Diamondback still cannot avoid infringement by merely splitting a single claim element into two pieces, citing three Federal Circuit cases dealing with the doctrine of equivalents ("DOE").

In its Reply, Diamondback asserts that the frame and the frame rail on the DB380 are separate structures and that Defendants cannot rely on the DOE because they never offered a DOE theory of infringement during discovery and should not be permitted to inject such a theory into the case at this point.  Diamondback notes that during discovery, Diamondback asked Defendants in an interrogatory to "[i]dentify each claim of the '914 Patent [Defendants] contend is infringed by [Diamondback], specifying the product (or product line) . . . and whether the claim limitation is satisfied literally or under the doctrine of equivalents." (Ex. A to Doc. 93, at 2).  In their response to that interrogatory, Defendants stated: "Claims 1-6, 8 and 12 are literally infringed by the Diamondback Firearms DB380 line of pistols."  (Id.).  Defendants did not mention the DOE in that response.  (See id.).

Diamondback does not cite any case law in support of its contention that Defendants should not now be permitted to assert infringement under the DOE, but the Court's own research reveals that waiver of this theory has been found in some cases but rejected in

others.[9] Whether the opposing party—here, Diamondback—has been prejudiced by the late disclosure is a pertinent consideration.[10] Diamondback does not identify any prejudice it has suffered by the late disclosure or describe what discovery would be required on this issue. (See Doc. 93 at 4). At the final pretrial conference, the parties will be permitted an opportunity to argue the issue of whether Defendants may rely on the DOE as to Claim 8.

Moreover, regardless of whether Defendants may rely on the DOE at this point, Diamondback has not persuaded the Court that the frame rail on its gun cannot satisfy the claim limitation that the "f[r]ame has an arresting surface thereon" even under a literal infringement analysis. The summary judgment filings focus on the DOE theory and on whether the frame rail is part of the frame, but Diamondback has not explained why the fact

---

[9]Compare, e.g., Genentech, Inc. v. Amgen, Inc., 289 F.3d 761, 773-74 (Fed. Cir. 2002) (finding no abuse of discretion in district court's preclusion of patentee from proceeding on DOE theory where patentee did not include that theory in a claim chart as strictly required by a local rule), and PolyVision Corp. v. Smart Techs. Inc., 501 F. Supp. 2d 1068, 1083 (W.D. Mich. 2007) (finding that patentee would not be permitted to raise the DOE because it failed "to assert it in a timely manner" when "[it] failed to raise the issue in its discovery responses or in a timely-filed expert report" and "[i]nstead . . . first disclosed this argument in its response to [a] motion for summary judgment"), with Augme Techs., Inc. v. Tacoda LLC, No. 07 Civ. 7088(CM)(GWG), 2011 WL 5547983, at *8 (S.D.N.Y. Nov. 14, 2011) (finding no waiver of DOE argument where patentee did not raise DOE theory until response to summary judgment motion but "the parties were not required to serve their final infringement contentions and charts prior to the date on which [other party] filed its motion for summary judgment"), and U.S. Gypsum Co. v. LaFarge N. Am., Inc., 508 F. Supp. 2d 601, 619-20 (N.D. Ill. 2007) (declining to preclude DOE argument that was raised for first time in response to summary judgment, noting in part that the opposing parties did not "point to any prejudice they suffered" by the late raising of the argument).

[10]See, e.g., PolyVision, 501 F. Supp. 2d at 1083 (disallowing DOE where tardy disclosure "effectively precluded [opposing party] from developing the issue during discovery); U.S. Gypsum, 508 F. Supp. 2d at 620 (declining to preclude DOE argument where opponents did not identify prejudice or "contend that they omitted taking any fact discovery that would have only been necessary if the doctrine of equivalents were at issue").

that the frame rail is separately manufactured and inserted into the frame as attested by Brady would prevent the frame rail from being an arresting surface on the frame as stated in the claim.  The parties did not request construction of this claim term; claim construction is a matter of law for the court.  The parties will also be permitted an opportunity to argue this point at the final pretrial conference.

Diamondback is not entitled to summary judgment of noninfringement as to Claim 8.

### IV.  Conclusion

In accordance with the foregoing, it is **ORDERED** and **ADJUDGED** that Diamondback's Motion for Summary Judgment as to Noninfringement (Doc. 74) is **DENIED**.

**DONE** and **ORDERED** in Orlando, Florida this 19th day of October, 2012.

JOHN ANTOON II
United States District Judge

Copies furnished to:
Counsel of Record