# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**DIAMONDBACK FIREARMS, LLC,**

<b>Plaintiff,</b>

**-vs-**                                        **Case No.  6:10-cv-1664-Orl-28DAB**

**SAEILO, INC., and KOOK JIN MOON,**

<b>Defendants.</b>

_____

# ORDER

This patent infringement controversy involving firing mechanisms for handguns is currently before the Court on the Motion for Summary Judgment as to Invalidity (Doc. 75) filed by Plaintiff, Diamondback Firearms, LLC ("Diamondback").  Having considered the parties' submissions,[1] the Court concludes that Diamondback's motion must be denied.

### I.  Background

The patent-in-suit is U.S. Patent No. 5,502,914 ("the '914 Patent"), which is assigned to Defendants.  The application that became the '914 Patent was filed on June 25, 1993. Titled "Striker Cocking and Firing Mechanism for a Handgun," the '914 Patent issued on April 2, 1996.  Sometime in 2007, Diamondback employees began designing a gun called the DB380, and it went into production in 2008 or 2009.  In September 2010, Defendants sent a letter to Diamondback asserting ownership of the '914 Patent and asking that

_____

[1]The pertinent filings are Diamondback's Motion for Summary Judgment as to Invalidity (Doc. 75), Defendants' Response in Opposition (Doc. 92) thereto, and Diamondback's Reply (Doc. 96).

Diamondback show how Diamondback's 380 series of pistols did not fall within the '914 Patent's scope. (Letter, Ex. 2 to Doc. 20). Diamondback then filed this lawsuit on November 9, 2010, (Doc. 1); in its Amended Complaint (Doc. 20), Diamondback seeks a declaratory judgment of noninfringement and invalidity of the '914 Patent. Diamondback's Motion for Summary Judgment as to Invalidity is now ripe for ruling.[2]

## II.  Summary Judgment Standards

"Summary judgment is appropriate when, drawing all justifiable inferences in the nonmovant's favor, there exists no genuine issue of material fact and the movant is entitled to judgment as a matter of law." Fujitsu Ltd. v. Netgear Inc., 620 F.3d 1321, 1325 (Fed. Cir. 2010). "When evaluating a motion for summary judgment, the court views the record evidence through the prism of the evidentiary standard of proof that would pertain at a trial on the merits." Eli Lilly & Co. v. Barr Labs., Inc., 251 F.3d 955, 962 (Fed. Cir. 2001).

"An issued patent enjoys a presumption of validity, 35 U.S.C. § 282, that can be overcome only through clear and convincing evidence." Univ. of Rochester v. G.D. Searle & Co., 358 F.3d 916, 920 (Fed. Cir. 2004). Thus, "a party 'seeking to invalidate a patent at summary judgment must submit . . . clear and convincing evidence of invalidity.'" Id. (quoting Eli Lilly & Co., 251 F.3d at 962). "Clear and convincing evidence is such evidence that produces 'an abiding conviction that the truth of [the] factual contentions [is] highly probable.'" ActiveVideo Networks, Inc. v. Verizon Comm'cns, Inc., 694 F.3d 1312, 1327 (Fed. Cir. 2012) (first alteration in original) (quoting Colorado v. New Mexico, 467 U.S. 310,

---

[2]Diamondback also filed a Motion for Summary Judgment as to Noninfringement (Doc. 74). That motion was denied in a separate Order (Doc. 111).

316 (1984)) (further internal quotation omitted).

### III.  Discussion

The '914 Patent contains fifteen claims, and the claims asserted as infringed are Claims 1 through 6, 8, and 12.  In its summary judgment motion, Diamondback argues that Claim 12 is invalid as anticipated by U.S. Patent No. 4,539,889 ("the Glock Patent") and that Claims 1 through 6 and 8 are invalid as obvious in view of the Glock Patent and U.S. Patent No. 5,157,209 ("the Dunn Patent").[3]  After describing the '914 Patent, the Glock Patent, and the Dunn Patent, the Court addresses these invalidity arguments in turn.

### A.  The '914 Patent

The specification of the '914 Patent describes the objects of the invention as "to provide an improved compact striker cocking and firing mechanism for a firearm," with the design of the mechanism being compact and "provid[ing] a smooth trigger pull and a single pull action for cocking and releasing the firing pin."  ('914 Patent, Ex. A to Doc. 75, col.2 ll.9-14).  The specification describes a striker-fired handgun that includes a "trigger attached to a trigger bar which operates a cocking and releasing element," (id. col.2 ll.16-18); the "cocking and releasing element" is referred to in parts of the '914 Patent as a "cocking and releasing cam."

The striker of the gun has a tongue and begins in an uncocked position.  The striker

_____

[3]It is undisputed that both of these patents qualify as prior art.  (See Joint Pretrial Statement, Doc. 100, at 8).  The Glock Patent issued on September 10, 1985, and the Dunn Patent issued on October 20, 1992.  The Glock Patent is listed among the references cited in the Dunn Patent, and the Dunn Patent is listed among the references cited in the '914 Patent but the Glock Patent is not.

is moved to a "half-cocked position" by racking of the slide, which positions the tongue of the striker behind the cocking and releasing element.  The pulling of the trigger moves the trigger bar forward, which rotates the cocking and releasing element toward the rear of the gun; this rotation of the cocking cam moves the striker backward to its "fully-cocked position.  As the cam continues to rotate after the trigger pull, it releases the striker so that the striker moves forward under spring pressure to detonate a loaded cartridge primer.  (Id. col.2 ll.16-22).

In some of its claims, the '914 Patent also includes a means for disconnecting the trigger assembly from the cocking cam after release of the striker.  The specification explains that after the striker is released, the trigger bar disconnects from the cam and the cam springs back to its first position.  (Id. col.3 ll.39-49).

The '914 Patent explains that the described gun "has a double action and that pulling the trigger both cocks and releases the striker."  (Id. col.4 ll.1-3).  "The cocking and releasing cam also serves as a striker block when the striker is in its half-cocked position so that the striker cannot escape from the latter position unless the trigger is pulled."  (Id. col.4 ll.3-6).  Additionally, the specification notes that "[a] long trigger pull is required to produce the necessary angular displacement of the cocking and releasing cam (over 60°) necessary to move the striker from its half-cocked to its fully-cocked and releasing position."  (Id. col.4 ll.34-37).

Figure 5 of the '914 Patent illustrates the gun and some of its components in its half-cocked position.  In this figure, the striker is 24; the tongue of the striker is 26; the striker spring is 28; the trigger bar is 20; and the cocking cam is 22:



Figure 3 of the '914 Patent is a view of the gun oriented in the direction opposite that of Figure 5 and illustrating the gun in its fully-cocked position—just prior to release of the striker by the cocking cam as the cocking cam turns counterclockwise with the trigger pull:



B.  The Glock Patent

The Glock Patent (Ex. B to Doc. 75) is titled "Automatic Pistol With Counteracting Spring Control Mechanism."  The "Background of the Invention" section of the Glock Patent describes existing automatic pistols as "relatively complicated to use" and as typically having their firing mechanism hold the firing element in its cocked position, rendering the pistol

"sensitive to jarring or dropping."  (Glock Patent col.1).  One of the stated objects of the invention of the Glock Patent is "to provide an easy-to-use but very safe automatic pistol which can be produced at low cost."  (Id. col.2 ll.14-16).

The "Summary of the Invention" portion of the Glock Patent describes the striker[4] as movable between a rear position and a forward position; additionally, it describes an intermediate position of the striker at which an "abutment" is engageable with the striker. The abutment is "displaceable backward" from that point, and "[l]ink means is connected between the trigger and the abutment for displacing [the abutment] backward into the rear position from the intermediate position" upon pulling of the trigger.  (Id. col.2 ll.38-41). Because the striker starts at an intermediate position of its path of travel, "the firing mechanism can be such that the trigger force is substantially less than with the known pistols."  (Id. col.2 ll.49-51).

The Glock Patent explains:  "[T]he pistol is always uncocked or at least partially uncocked.  The cocking for each shot is effected by the trigger and is assisted by a spring, so that the condition of the pistol is the same before the first shot as it is before the subsequent shots."  (Id. col.2 ll.63-68).  "[W]hen the [striker] is in the intermediate position the abutment prevents any displacement of the [striker] relative to the abutment.  Accidental discharge of the pistol therefore is impossible."  (Id. col.3 ll.5-9).

The abutment is described as "displaceable laterally relative to the" striker, and the

_____

[4]The Glock Patent discloses embodiments for both striker-fired and hammer-fired pistols and sometimes refers to a "firing element" instead of to a "striker."  For ease of discussion, this Order will refer to the firing element as a striker.

link means "displace[es] the abutment into the out-of-path position on" pulling of the trigger. (Id. col.3 ll.11-16).  Because the abutment moves in a direction perpendicular to the travel direction of the striker, "if the pistol is jarred . . . it is virtually impossible for the necessary forces to be exerted on the mechanism to fire the pistol."  (Id. col.3 ll.16-22).

The Glock Patent describes several embodiments, and in one of the embodiments the abutment is "a lever."  This embodiment is illustrated in Figures 13 and 15 of the Glock Patent:



In these figures, the lever is 103 and the "nose" of the striker is 101.  When the trigger slide 115 is pushed back by the trigger, the lever 103 and the nose 101 are pushed back.  "This fully loads the firing-bolt spring." (Id. col.10 l.2).  "When the lever 103 reaches its rear end position," the trigger slide is moved down and the lever 103 also moves down.  (Id. col.10 ll.3-8).  This moves the end of the lever out of the path of the striker nose, and the striker is propelled forward and fires the cartridge.  (Id. col.10 ll.8-12).

C.  The Dunn Patent

The Dunn Patent (Ex. C to Doc. 75) is titled "Semi-Automatic Safety Handgun" and states in its Abstract that it pertains to "a simplified firing mechanism that includes a manual safety system and a doubly redundant automatic safety system." (Dunn Patent cover page). The components of its firing mechanism include "a trigger bar, a trigger lever, a firing pin safety, spring loaded striker with a firing pin, a sear, a dislocator and a manual safety." (Id.). It describes its invention as "relat[ing] to automatic and manual safety systems for preventing inadvertent discharge and automatic cycling of semi-automatic firearms." (Id. col.1 ll.8-11).

The "Background of the Invention" section of the Dunn Patent notes that "[e]xisting designs are complex and expensive to manufacture" and explains that "[m]any existing safety systems reduce the combat readiness of the firearm, and conversely, to increase the combat readiness one must compromise the protection provided by the safety systems." (Id. col.1 ll.18-19, 24-27).  This section then explains that the Glock Patent "discloses a striker fired mechanism with fewer parts, but requires a trigger pull similar to a double action mechanism for every shot." (Id. col.1 ll.35-38).  This section also states that "in the event of a sear failure" the Glock Patent is "able to approach the battery position in a fail-unsafe condition" and notes that pistols manufactured based on the Glock Patent "are without a manual safety, and as such may be discharged by any form of inadvertent trigger pull." (Id. col.1 ll.43-46, 49-52).  In light of this background, the Dunn Patent then explains that "a need exists for a novel firearm design which has:  a simple firing mechanism which is inexpensive to manufacture; multiple safety systems which prevent as many of the known types of inadvertent discharge as possible; and superior combat readiness without compromising

safety features." (Id. col.1 ll.53-58).

The Dunn Patent describes a "single action" type of operation in a gun that includes a manual safety as well as two automatic safety mechanisms.  The manual safety "moves the striker rearwardly away from a chamber cartridge when activated, blocks any forward movement of the striker, and simultaneously disengages the trigger from the striker." (Id. col.2 ll.1-4).  The first automatic safety mechanism of the Dunn Patent is a striker block located between the striker and a chambered cartridge.  (Id. col.2 ll.8-11).  The second automatic safety mechanism "disconnects the trigger from the striker while the slide is cycling and does not permit re-engagement of the trigger with the striker at the end of the cycle until the trigger has been fully released." (Id. col.2 ll.14-18).

The gun described in the preferred embodiment of the Dunn Patent has a sear that rotates on a sear pin; along with other components, the sear "serves to connect the trigger . . . to the striker." (Id. col.4 ll.61-65).  After the slide is racked, the nose of the sear restrains forward movement of the striker.  (Id. col.4 l.65-col.5 l.8).  A dislocator also rotates on the sear pin, and along with other components the dislocator "serves to disconnect the trigger . . . from the sear . . . except at appropriate times during a firing cycle to provide a redundancy of safety." (Id. col.5 ll.9-15).

Figure 15 of the Dunn Patent shows one embodiment of the gun in its fully-cocked position.  In this figure, the trigger bar is 194; the sear is 158; and the striker is 114.



*FIG. 15*

When the trigger is pulled, the trigger bar moves forward, and a finger on the trigger bar engages the dislocator and rotates the dislocator counterclockwise.  (Dunn Patent col.6 ll.7-10).  The finger on the trigger bar then engages the sear and rotates it counterclockwise, which moves the nose of the sear downward and releases the leg of the striker; the striker then is propelled forward by the striker spring and the gun is fired.  After each discharge of the gun, the rearward portion of the trigger bar is moved downward and the finger of the trigger bar disengages from both the sear and the dislocator, releasing both.  (Id. col.6 ll.23-34).  If the trigger is not fully released before being pulled again, the striker cannot be released, and this "obviates any possibility of a fully automatic firing sequence."  (Id. col.7 ll.13-21).

D.  Anticipation

"Under 35 U.S.C. § 102 a claim is anticipated 'if each and every limitation is found either expressly or inherently in a single prior art reference.'"  King Pharms., Inc. v. Eon Labs, Inc., 616 F.3d 1267, 1274 (Fed. Cir. 2010) (quoting Celeritas Techs. Ltd. v. Rockwell

Int'l Corp., 150 F.3d 1354, 1360 (Fed. Cir. 2008)).  To establish anticipation of a patent claim, a party must prove by clear and convincing evidence the presence of every limitation in that single reference.  Crown Packaging Tech., Inc. v. Ball Metal Beverage Container Corp., 635 F.3d 1373, 1383 (Fed. Cir. 2011).

"Section 102 embodies the concept of novelty—if a device or process has been previously invented (and disclosed to the public), then it is not new, and therefore the claimed invention is 'anticipated' by the prior invention."  Net MoneyIN, Inc. v. VeriSign, Inc., 545 F.3d 1359, 1369 (Fed. Cir. 2008).  "Anticipation under 35 U.S.C. § 102 is a question of fact."  ActiveVideo Networks, 694 F.3d at 1327.  Nevertheless, the issue of anticipation "may be decided on summary judgment if the record reveals no genuine dispute of material fact."  Golden Bridge Tech., Inc. v. Nokia, Inc., 527 F.3d 1318, 1321 (Fed. Cir. 2008).

"Because the hallmark of anticipation is prior invention, the prior art reference—in order to anticipate under 35 U.S.C. § 102—must not only disclose all elements of the claim within the four corners of the document, but must also disclose those elements 'arranged as in the claim.'"  Net MoneyIN, 545 F.3d at 1369 (quoting Connell v. Sears, Roebuck & Co., 722 F.2d 1542, 1548 (Fed. Cir. 1983)).  "[U]nless a reference discloses . . . not only all of the limitations claimed but also all of the limitations arranged or combined in the same way as recited in the claim, it cannot be said to prove prior invention of the thing claimed and, thus, cannot anticipate under 35 U.S.C. § 102."  Id. at 1371.

The inquiry into anticipation "proceeds on a claim-by-claim basis."  Finisar Corp.v. DirecTV Grp., Inc., 523 F.3d 1323, 1334 (Fed. Cir. 2008).  The only claim of the '914 Patent that Diamondback asserts is anticipated is Claim 12, an independent claim that describes

a firearm containing a firing mechanism that includes a striker, "first biasing means for urging said striker toward [the] striking position," a cocking and releasing element, "second biasing means for urging [the] cocking and releasing element towards its first position," and a trigger assembly.

Diamondback asserts in its motion that "[b]oth parties' experts agree [that] the Glock Patent discloses every element of Claim 12 of the '914 Patent, rendering it invalid as anticipated by the Glock Patent." (Doc. 75 at 2-3). However, the Court cannot agree with Diamondback's characterization of expert agreement on this point.

Diamondback's expert, John Nixon, opined in his expert report that "[i]t is [his] opinion that at least Claim 12 of the '914 patent is anticipated by" the Glock Patent. (See Nixon Expert Report, Attach. to Doc. 75, at 15). In support of this one-sentence opinion, Nixon referred to claim charts listing the elements of Claim 12 and the elements of the Glock Patent that he believes correspond to those elements. (See id. (citing Invalidity Claim Charts, Ex. F thereto)).

In response to Nixon's report, Defendants disclosed the report of their expert, Seth Bredbury. In that report, dated April 6, 2012, Bredbury disagreed with Nixon and opined that as to one element of Claim 12—"second biasing means for urging said cocking and releasing element towards its first position"—the Glock Patent teaches the opposite, i.e., that the cocking and releasing element is biased away from its first position and toward its second position. (Bredbury Report, Attach. to Doc. 92, at 24). A month later, when Bredbury was deposed, Diamondback's counsel asked Bredbury element by element whether each limitation of Claim 12 was present in the Glock Patent; Bredbury answered "yes" as to each,

including the "second biasing means" element. (Bredbury Dep., Ex. E to Doc. 75, at 12). It is this deposition testimony upon which Diamondback relies for its assertion of "expert agreement" and a "lack of dispute" on this point.

After his deposition, Bredbury completed an errata sheet changing the answer to the "second biasing means" question from "yes" to "no." Diamondback then moved to strike the errata sheet, and the magistrate judge granted that motion. (See Docs. 78 & 90). Thus, Bredbury's deposition answer remains in the record as a "yes." Nevertheless, the Court does not consider this point undisputed by the experts. Despite Bredbury's deposition testimony, his earlier expert report remains of record.[5] In that report, he did not agree that the "second biasing means" element was disclosed by the Glock Patent. Thus, the Court rejects the assertion in Diamondback's motion that it is entitled to summary judgment of anticipation based merely on this alleged agreement of experts on the point.

In its motion, Diamondback put forth no other basis for summary judgment as to anticipation other than this purported expert agreement. In its Reply (Doc. 96), Diamondback argues that in their Response Defendants "fail[ed] to refute Diamondback's evidence" of disclosure of the "second biasing means." As noted above, however, the experts disagree on the point, and it is Diamondback's burden to establish by clear and convincing evidence that every limitation of Claim 12 is present in the Glock Patent.

---

[5]The issue of witnesses giving inconsistent testimony is not unusual. The more typical situation involves a witness who contradicts deposition testimony with a later-filed affidavit. Such contradiction is generally not permitted, as noted in the cases cited in the magistrate judge's order striking Bredbury's errata sheet. (See Order, Doc. 90). In this case, Bredbury's more favorable testimony was given first, not second. Under these circumstances the prior testimony will not be completely discounted.

Diamondback has failed to do so.

In its Reply, Diamondback relies on the following paragraph of the Glock Patent in attempting to establish that the Glock Patent includes "second biasing means for urging [the] cocking and releasing element towards its first position"—language that describes Figures 13 and 15 reproduced earlier:

> A nose 101 formed unitarily with the firing bolt 26 projects down and toward the front from the breech 5. . . . Engaged in the path of the nose 101 is the abutment end 102 of a lever 103 which is formed on its other end with a slot 104 that is traversed by a pivot pin 105, the lever 103 therefore being limitedly displaceable transverse to the breech 5 in the frame 1.  A spring 106 fixed in the frame 1 presses with its free end against the pivoted end of the lever 103 so that the outer end of the slot 104 bears on the pivot pin 105, that is so that the lever 103 is moved up on the pin 105 toward the slide 5.  A hairpin spring 107 carried on the pin 105 has a short leg 108 anchored in the frame 1 and a long leg 109 bearing on a pin 110 which is fixed on the lever 103.  This spring 108 therefore urges the lever clockwise toward a position lying on a stop 111 in the frame 1 . . . .

(Glock Patent col.9 ll.16-33).   In the invalidity claim chart attached to his expert report, Diamondback's expert lists the spring 106 as the element that he believes constitutes the "second biasing means" in the Glock Patent; he provides no explanation for this opinion or any other facet of his anticipation opinion.

A few paragraphs later, the Glock Patent states:

> In the uncocked position of the pistol the lever 103 is urged by the spring 107 against the stop 111.  If the slide 2 is shifted back in order to chamber the first cartridge from the clip, the nose 101 slides over the end surface 125 of the lever 103 and moves it down against the force of the spring 106.  As a result the lever 103 can be passed by the nose 101.

(Glock Patent col.9 ll.52-58).  Defendants' expert, Bredbury, relies on part of this language

-14-

in opining in his report that the Glock Patent explains biasing away from the first position and towards the second position—not biasing toward the first position as stated in Claim 12 of the '914 Patent.  Bredbury states:  "[T]he abutment which cocks the firing pin is the rear surface 102 of the lever 103.  This lever rotates about pin 105.  This rotary motion is biased by spring 107 which biases it towards the position in which the firing pin is fully cocked, 'in the uncocked position of the pistol the lever 103 is urged by the spring 107 against the stop 111.'"  (Bredbury Report at 24 (quoting Glock Patent col. 9 ll. 52-53)).  Bredbury further states:  "The lever 103 is also displaceable transverse to the direction of firing pin motion by virtue of the slot 104 in the lever 103.  The motion in this transverse direction is biased by spring 106 such that the firing pin engaging end of the lever is urged upwards into engagement with the firing pin tongue."  (Id.).  Defendants argue that the Glock Patent describes a trigger pull that is assisted by a spring, unlike the '914 Patent, which has a second biasing means that resists rather than assists the trigger pull.  (See Doc. 92 at 3-4).

Diamondback argues that the Glock Patent's description of the spring 106 pressing against one end of the lever 103 and moving it up on the pin 105 discloses urging the lever 103 "up towards its first position."  (Doc. 96 at 3 (citing Glock patent. col. 9 ll. 24-28 and Fig. 13)).  However, it is not clear that moving the lever "up" on the pin is the same as "urging [it] towards its first position" as stated in the '914 Patent.  Moreover, Diamondback argues that Defendants have ignored the spring 106, but Bredbury did refer to the spring 106 in his report and explained that it urges the lever into engagement with the firing pin tongue; in contrast, Diamondback's expert provided no explanation for his identification of the spring 106 as the "second biasing means."

-15-

In sum, there is a factual dispute over whether there is a "second biasing means" in the Glock Patent that urges the cocking and releasing element towards its first position. There are several springs disclosed in the Glock Patent, and the Court cannot conclude on this record that any of these springs urges the cocking and releasing element "towards its first position" as stated in the claims of the '914 Patent.  Consequently, Diamondback has not met its burden of presenting clear and convincing evidence that Claim 12 of the '914 Patent is anticipated by the Glock Patent.  Diamondback's motion for summary judgment on this point is denied.

E.  Obviousness

Even if a claim is not invalid as anticipated under 35 U.S.C. § 102, it can still be found invalid as obvious under 35 U.S.C. § 103.  This section provides in part:  "A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 . . . if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art[6] to which said subject matter

---

[6]"The actual inventor's skill is irrelevant to the inquiry . . . ."  Std. Oil Co. v. Am. Cyanamid Co., 774 F.2d 448, 454 (Fed. Cir. 1985).  "The statutory emphasis is on a person of *ordinary* skill.  Inventors, as a class, according to the concepts underlying the Constitution and the statutes that have created the patent system, possess something—call it what you will—which sets them apart from the workers of *ordinary* skill, and one should not go about determining obviousness under § 103 by inquiring into what *patentees*, (i.e., inventors) would have known or would likely have done, faced with the revelations of references."  Id.  "A person of ordinary skill in the art is also presumed to be one who thinks along the line of conventional wisdom in the art and is not one who undertakes to innovate, whether by patient, and often expensive, systematic research or by extraordinary insights, it makes no difference which."  Id.

pertains." 35 U.S.C. § 103(a).  Diamondback asserts that Claims 1 through 6 and Claim 8 of the '914 Patent are invalid as obvious in light of the Glock Patent and the Dunn Patent.

"A party seeking to invalidate a patent on the basis of obviousness must demonstrate 'by clear and convincing evidence that a skilled artisan would have been motivated to combine the teachings of the prior art references to achieve the claimed invention, and that the skilled artisan would have had a reasonable expectation of success in doing so.'" Kinetic Concepts, Inc. v. Smith & Nephew, Inc., 688 F.3d 1342, 1360 (Fed. Cir. 2012) (quoting Procter & Gamble Co. v. Teva Pharms. USA, Inc., 566 F.3d 989, 994 (Fed. Cir. 2009)) (further internal quotation omitted).  "While an analysis of any teaching, suggestion, or motivation to combine elements from different prior art references is useful in an obviousness analysis, the overall inquiry must be expansive and flexible." Id. (citing KSR Int'l Co. v. Teleflex, Inc., 550 U.S. 398, 415, 419 (2007)).

"Obviousness under § 103 is a question of law based on underlying factual determinations." Genetics Inst., LLC v. Novartis Vaccines & Diagnostics, Inc., 655 F.3d 1291, 1302 (Fed. Cir. 2011).  "These underlying factual inquiries are:  (1) the scope and content of the prior art; (2) the differences between the prior art and the claims at issue; (3) the level of ordinary skill in the field of the invention [at the time of the invention]; and (4) objective considerations such as commercial success, long felt need, and the failure of others." Alcon Research, Ltd. v. Apotex Inc., 687 F.3d 1362, 1365-66 (Fed. Cir. 2012). "[T]he obviousness inquiry requires examination of all four [of these] factors." Kinetic

<u>Concepts</u>, 688 F.3d at 1360.[7]

"What a reference teaches, whether there is a trend or demand in the relevant marketplace or design community, the background knowledge of one of skill in the art—these are all questions reserved for the finder of fact." <u>TriMed, Inc. v. Stryker Corp.</u>, 608 F.3d 1333, 1341 (Fed. Cir. 2010). Nevertheless, "[s]ummary judgment of obviousness is appropriate if 'the content of the prior art, the scope of the patent claim, and the level of ordinary skill in the art are not in material dispute, and the obviousness of the claim is apparent in light of these factors.'" <u>Id.</u> (quoting <u>KSR</u>, 550 U.S. at 427).

"[A] patent composed of several elements is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art." <u>KSR</u>, 550 U.S. at 418. Thus, even if the Glock and Dunn Patents "disclose[] all of the limitations of the asserted claims . . . [Diamondback] still need[s] to [present] evidence indicating why a person having ordinary skill in the art would combine the references to arrive at the claimed invention." <u>Kinetic Concepts</u>, 688 F.3d at 1366. "[W]hether there is a reason to combine prior art references is a question of fact." <u>Id.</u> at 1367.

"At bottom, the obviousness analysis is a common sense test, and '[i]f a person of ordinary skill . . . would have found the invention [a] predictable and achievable variation or combination of the prior art, then the invention likely would have been obvious.'" <u>Woods v. DeAngelo Marine Exhaust, Inc.</u>, 692 F.3d 1272, 1286 (Fed. Cir. 2012) (alterations in original)

---

[7]These four factors are called "<u>Graham</u> factors," a reference to <u>Graham v. John Deere Co. of Kansas City</u>, 383 U.S. 1 (1966). <u>See</u> <u>Kinetic Concepts</u>, 688 F.3d at 1360 (noting that "courts must consider all of the <u>Graham</u> factors prior to reaching a conclusion with respect to obviousness").

(quoting <u>Rolls-Royce, PLC v. United Techs. Corp.</u>, 603 F.3d 1325, 1338 (Fed. Cir. 2010)).

Like anticipation, obviousness is evaluated "'on a claim-by-claim basis.'"  <u>Aventis Pharma</u>

<u>Deutschland GmbH v. Lupin, Ltd.</u>, 499 F.3d 1293, 1303 (Fed. Cir. 2007) (quoting <u>DyStar</u>

<u>Textilfarben GmbH & Co. Deutschland KG v. C.H. Patrick Co.</u>, 464 F.3d 1356, 1372 (Fed

Cir. 2006)).  "At all times, the burden is on the [party asserting obviousness] to establish by

clear and convincing evidence that the patent is obvious."  <u>Kinetic Concepts</u>, 688 F.3d at

1360.

As earlier noted, Diamondback asserts that Claims 1 through 6 and Claim 8 are

obvious in light of the Glock Patent and the Dunn Patent.  Claim 1 is an independent claim

upon which each of these other claims depends.[8]  The four obviousness factors and the

ultimate conclusion as to obviousness will be addressed with regard to Claim 1, and

arguments as to the dependent claims will then be noted.

Claim 1 is similar to Claim 12—discussed earlier in the anticipation analysis—and

claims a firearm comprising a frame, a slide, and a firing mechanism.  As in Claim 12, the

firing mechanism of Claim 1 includes a striker, "first biasing means," a cocking and releasing

element, "second biasing means," and a trigger assembly.  Unlike Claim 12, the Claim 1

firing mechanism additionally includes "disconnecting means for disengaging [the] trigger

assembly from [the] cocking and releasing element after [the] striker has been released by

[the] cocking and releasing element and in response to movement of [the] slide to [the]

retracted position."  ('914 Patent col.5 ll.9-13).

---

[8]Claim 3 is stated as depending on Claim 2, and Claim 6 is stated as depending on
Claim 5.  Because both Claim 2 and Claim 5 depend on Claim 1, Claims 3 and 6 do as well.

1.  Scope and Content of the Prior Art

The parties agree as to some aspects of the disclosures of the Glock and Dunn Patents.  For example, it is undisputed that the Glock Patent discloses a lever—not a rotary cam—as one embodiment of a cocking and releasing element and that the lever holds the striker in a partially-cocked position before the trigger is pulled in order to fully cock the gun and fire it.

It is also undisputed that the Dunn Patent uses a rotational sear to hold the striker in its fully-cocked position and that the Dunn Patent does not describe a mechanism in which the striker is held in an intermediate position; instead the striker moves from its uncocked position to its fully-cocked position without an intermediate stop.  Moreover, Defendants apparently do not dispute that the Dunn Patent discloses a means for disconnecting the trigger assembly from the sear.[9]

However, the parties dispute other facets of these prior art references.  As discussed above with regard to anticipation, the parties do not agree on whether the Glock Patent

_____

[9]As noted earlier in the text, the difference between Claim 1 and Claim 12 is that Claim 1 includes "disconnecting means for disengaging [the] trigger assembly from [the] cocking and releasing element after [the] striker has been released by the cocking and releasing element."  In his expert report, Bredbury seemed to dispute somewhat Nixon's opinion regarding the presence of a disconnecting means, stating that the parts referred to by Nixon "are used to disconnect the trigger bar from the trigger, not the sear."  (See Bredbury Report at 26 (discussing paragraph 46 of Nixon's report)).  However, in his deposition Bredbury testified that the Dunn Patent describes a mechanism for disengaging the trigger bar from the sear and at the same time disengaging the trigger bar from the trigger.  (Bredbury Dep. at 46-48).  Defendants do not address the "disconnecting means" element in their summary judgment response except in arguing that there would have been no reason to combine the two patents to add to the Glock Patent a disconnecting means.  (See Doc. 92 at 13-14).

discloses a "second biasing means for urging [the] cocking and releasing element towards its first position."  This is a limitation of Claim 1 and thus of all of the dependent asserted claims as well.  This is a significant factual dispute.

The parties also dispute whether the sear in the Dunn Patent is a "cocking and releasing element"—a limitation of all of the asserted claims.  Defendants assert that the Dunn sear is only a "releasing element" because it does not cock the striker but only holds it in its fully-cocked position after the racking or recoil of the slide cocks it.  Diamondback, on the other hand, asserts that the Dunn sear also serves a cocking function because the gun could not be cocked without it and that therefore it is a "cocking and releasing element."

2.  Differences Between the Prior Art and the Claims

Diamondback argues that the '914 Patent is a combination of familiar elements that yields predictable results.  As noted earlier, however, Diamondback has not presented clear and convincing evidence that the Glock Patent discloses a "second biasing means for urging [the] cocking and releasing element towards its first position."  Thus, on this basis alone, Diamondback has not presented clear and convincing evidence that all of the elements of the asserted claims of the '914 Patent are present in the prior art so as to support its "obvious combination" argument.

Defendants also point out other differences in the patents.  They again emphasize that the Glock Patent describes a spring-assisted trigger pull, which the '914 Patent does not employ.  They also note that the Glock Patent describes displacement of the abutment laterally relative to the direction of the striker's path of travel; in the '914 Patent, however, the cocking cam rotates back and beyond the striker in the direction opposite—not perpendicular

to—the direction of travel of the striker.  Defendants also emphasize differences between the designed functionality of the Dunn Patent gun versus the Glock Patent and '914 Patent guns.

"Even if the references disclosed all of the limitations of the asserted claims . . . [Diamondback] still need[s] to [present] evidence indicating why a person having ordinary skill in the art would combine the references to arrive at the claimed invention."  Kinetic Concepts, 688 F.3d at 1366.  "Significantly, whether there is a reason to combine prior art references is a question of fact."  Id. at 1367.

Here, the parties' experts have offered conflicting opinions as to whether a person of skill in the art would have a reason to combine the references.  Diamondback's expert states in his report that "[t]here are a number of reasons why one of skill in the art would have combined the teachings of the [Glock Patent] and the [Dunn Patent]."  (Nixon Report ¶ 42).  He then lists two reasons—first, that the Dunn Patent discusses the Glock Patent in a manner that Nixon characterizes as claiming "a safety improvement over the [Glock] Patent because it prevents accidental discharge using a striker block very similar to the striker blocking structure described in the '914 Patent," (id.), and second, that "there is evidence that elements of the [Dunn] Patent and the [Glock] Patent can be successfully combined," referring to use in commercial Glock pistols of a striker blocking element like the one disclosed in the Dunn patent, (id. ¶ 43).

Defendants' expert, on the other hand, opines that modifying the pistols of the Glock Patent to incorporate a disconnecting means "would require a complete redesign of the mechanism."  (Bredbury Report at 29).  Defendants argue that the Glock and Dunn Patents describe two different approaches to firing mechanisms that do not readily suggest a

combination.

### 3.  Level of Ordinary Skill in the Art

Diamondback notes in its motion that there is no dispute as to the level of ordinary skill in the art.  The parties have agreed that one of skill in the art has "at least an undergraduate degree in mechanical engineering, metallurgy or chemistry with 3-8 years of experience in the design or manufacture of pistols, or has 10-20 years of experience in the design, manufacture or gun smithing of pistols along with demonstrated aptitudes in analyzing and evaluating mechanical drawings for functionality of the depicted mechanism." (See Doc. 28 at 9 n.5, cited in Doc. 75 at 4).

### 4.  Objective Secondary Considerations of Nonobviousness

Diamondback also notes in its motion that Defendants did not identify any evidence of objective secondary considerations of nonobviousness during discovery, and therefore Diamondback does not address this factor in its motion.  (See Doc. 75 at 4).  Defendants do not take issue with this assertion, though they do argue that commercial success of Glock pistols weighs against a suggestion to combine the Glock Patent with the Dunn Patent.

### 5.  The Ultimate Issue of Obviousness

As noted above, there is a factual dispute as to whether all of the elements of the asserted claims of the '914 Patent are disclosed by the Glock Patent and the Dunn Patent together.  Moreover, even if it were undisputed that all of the elements were disclosed by these two prior art references together, "'a patent composed of several elements is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art.'"  Kinetic Concepts, 688 F.3d at 1369 (quoting KSR, 550 U.S. at 418).

Even if it were established that all elements of the asserted claims were known in the prior art, Diamondback has also not presented clear and convincing evidence that a person of skill in the art would have a reason to combine those known elements.

In sum, both what a prior art reference teaches and whether there is a reason to combine known elements are questions of fact, and these issues are disputed here. Diamondback's motion for summary judgment as to obviousness consequently must be denied.

### 6.  Claims 2, 3, 4, 5, 6, and 8

The foregoing analysis with regard to Claim 1 also requires denial of summary judgment as to the invalidity of Claims 2, 3, 4, 5, 6, and 8.  Each of these claims depends on Claim 1,[10] and thus the factual disputes regarding Claim 1 are also factual disputes with

_____

[10]Claim 2 claims "[a] firearm as set forth in claim 1 wherein said trigger assembly includes a trigger bar connected to said trigger and engageable with said cocking and releasing element and said disconnecting means includes a trigger bar cam carried by said trigger bar and a cam surface on said slide for engaging said trigger bar cam."  Claim 3 claims "[a] firearm as set forth in claim 2 where said trigger bar is pivotally connected to said trigger and said cocking and releasing element is supported for angular movement relative to said frame."  Claim 4 claims "[a] firearm as set forth in claim 1, wherein said striker has a depending tongue and said cocking and releasing element comprises a cocking and releasing cam supported for angular movement by and relative to said frame and said cocking and releasing cam has a first cam lobe for engaging said tongue."  Claim 5 claims "[a] firearm as set forth in claim 1, wherein said cocking and releasing element comprises a cocking and releasing cam having a recess therein and supported for angular movement relative to said frame and said trigger assembly is engageable with said cocking and releasing cam within said recess."  Claim 6 claims "[a] firearm as set forth in claim 5 wherein said trigger is pivotally supported on said frame and said trigger assembly includes a trigger bar pivotally connected to said trigger and engageable with said cocking and releasing element."  Claim 8 claims "[a] firearm as set forth in claim 1 wherein said f[r]ame has an arresting surface thereon and said cocking and releasing element has an abutment surface for engaging said arresting surface when said cocking and releasing element is in its first position to maintain said cocking and releasing element in its first position."

regard to these claims.[11]

### IV.  Conclusion

In   accordance   with   the   foregoing,   it   is   **ORDERED**   and   **ADJUDGED**   that

Diamondback's Motion for Summary Judgment as to Invalidity (Doc. 75) is **DENIED**.

**DONE** and **ORDERED** in Orlando, Florida this 1st day of November, 2012.

JOHN ANTOON II
United States District Judge

Copies furnished to:
Counsel of Record

_____

[11]Diamondback argues that the Dunn Patent discloses the additional elements of these dependent claims that are not found in the Glock Patent.  The only argument that Defendants make regarding these dependent claims is that the Dunn Patent does not disclose a "cocking and releasing element" but instead only a sear that releases but does not cock the striker.  This element is also an element of Claim 1.