### UNITED STATES DISTRICT COURT
### MIDDLE DISTRICT OF FLORIDA
#### ORLANDO DIVISION

DIAMONDBACK FIREARMS, LLC,

        Plaintiff,

-vs-                          Case No.  6:10-cv-1664-Orl-28DAB

SAEILO, INC., and KOOK JIN MOON,

        Defendants.

---

## ORDER

This patent infringement case is before the Court on the Renewed Motion for Judgment as a Matter of Law or Alternatively for a New Trial (Doc. 202) filed by Plaintiff, Diamondback Firearms, LLC. The Court heard argument on this motion and other post-trial motions on October 10, 2013.[1] (See Mins., Doc. 219). As set forth below, Diamondback's motion is denied in all respects.

### I.  Background

The patent-in-suit is U.S. Patent No. 5,502,914 ("the '914 Patent"), which was issued to Defendant Kook Jin Moon on April 2, 1996, and is titled "Striker Cocking and Firing Mechanism for a Handgun." The specification of the '914 Patent explains the general

---

[1]The Court also heard argument on Defendants' Motion to Alter or Amend Final Judgment (Doc. 198) and Defendants' Motion for Entry of Injunctive Relief (Doc. 206). (See Doc. 219). After the argument, the Court denied Defendants' Motion for Entry of Injunctive Relief and granted in part Defendants' Motion to Alter or Amend Final Judgment, announcing that an amended judgment would be entered if still appropriate after ruling on Diamondback's motion. (See id.).

operation of a firearm that includes the patented cocking and firing mechanism. Such a firearm includes a "trigger attached to a trigger bar which operates a cocking and releasing element" that moves the striker from a "half-cocked position" to a "fully-cocked position" and then releases the striker, which moves forward under spring pressure to detonate a loaded cartridge primer. ('914 Patent col.2 ll.16-22).

In 2007, Diamondback began designing a .380-caliber pistol called the DB380. In September 2010, Defendants sent a letter to Diamondback asserting ownership of the '914 Patent and asking that Diamondback show how its 380 series of pistols did not fall within the scope of the '914 Patent. Diamondback then filed this lawsuit in November 2010. In its Amended Complaint, Diamondback requested a declaratory judgment of noninfringement and invalidity of the '914 Patent.

After the Court rejected Diamondback's proposed claim construction and denied Diamondback's motions for summary judgment as to noninfringement and invalidity, the case proceeded to a jury trial. The jury returned a verdict finding that Defendants had proved that Diamondback infringed all of the asserted claims of the '914 Patent—Claims 1 through 6, 8, and 12—and that Diamondback had not proved that Claim 12 was invalid based on anticipation or that any of Claims 1 through 6, 8, or 12 was invalid based on obviousness.

After the trial, Diamondback filed the Renewed Motion for Judgment as a Matter of Law or Alternatively for a New Trial that is now before the Court. In the motion, Diamondback raises seven arguments: (1) that the Court failed to properly construe a claim term; (2) that the asserted claims of the '914 Patent are invalid as indefinite because two

claim terms are not amenable to construction; (3) that, contrary to the jury's verdict, Claim 12 is invalid as anticipated by prior art; (4) that, contrary to the jury's verdict, Claims 1 through 6, 8, and 12 are invalid as obvious in light of prior art; (5) that, contrary to the jury's verdict, there was insufficient evidence of infringement; (6) that Defendants failed to present evidence of ownership of the '914 Patent; and (7) that the asserted claims are invalid because they are indefinite hybrid claims.

## II. Legal Standards

Diamondback brings its motion under Rules 50 and 59 of the Federal Rules of Civil Procedure. Rule 50 provides that a court may grant a motion for judgment as a matter of law where "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a). Rule 59 provides that "[t]he court may, on motion, grant a new trial on all or some of the issues—and to any party— . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A).

"'[J]udgment as a matter of law after the verdict may be granted only when, without weighing the credibility of the evidence, there can be but one reasonable conclusion as to the proper judgment.'" Pulte Home Corp. v. Osmose Wood Preserving, Inc., 60 F.3d 734, 739 (11th Cir. 1995) (quoting 5A James W. Moore et al., Moore's Federal Practice ¶ 50.07[2] (2d ed. 1995)). In ruling on a Rule 50 motion, the court "must draw all reasonable inferences in favor of the nonmoving party." Cleveland v. Home Shopping Network, Inc., 369 F.3d 1189, 1192-93 (11th Cir. 2004). "'Credibility determinations, the weighing of the evidence,

and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'" Id. at 1193 (quoting Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 150 (2000)). "'[A]lthough the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe.'" Id. (quoting Reeves, 530 U.S. 133 at 151).

Judgment as a matter of law "is appropriate when a [party] presents no legally sufficient evidentiary basis for a reasonable jury to find for him on a material element of his cause of action." Christopher v. Florida, 449 F.3d 1360, 1364 (11th Cir. 2006). "But if there is substantial conflict in the evidence, such that 'reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions, the motion must be denied.'" Id. (quoting Walker v. NationsBank of Fla. N.A., 53 F.3d 1548, 1555 (11th Cir. 1995)). "[A] district court should only grant a judgment as a matter of law or new trial when the verdict is against the clear weight of the evidence or will result in a miscarriage of justice." Ramirez v. E.I. Dupont De Nemours & Co., 454 F. App'x 760, 762-63 (11th Cir. 2011) (per curiam) (citing Lipphardt v. Durango Steakhouse of Brandon, Inc., 267 F.3d 1183, 1186 (11th Cir. 2001), and Hewitt v. B.F. Goodrich Co., 732 F.2d 1554, 1556 (11th Cir. 1984)).

### III.  Discussion

#### A.  Claim Construction

Diamondback first argues that the Court "failed to properly construe" the term "half-cocked," which appears in all of the asserted claims of the '914 Patent. Diamondback avers that the Court did not resolve the parties' dispute regarding this claim term and that as a

result, Diamondback "was prohibited from arguing its proposed construction" at trial while Defendants were given "free rein to describe the half-cocked position in multiple ways." (Doc. 202 at 3). Diamondback contends that the Court improperly allowed the parties to present arguments regarding the meaning and scope of "half-cocked" to the jury and that a new trial should be granted. However, the Court rejects Diamondback's assertion that the Court did not resolve the parties' claim construction dispute, and the parties did not argue the meaning of "half-cocked" to the jury. A new trial will not be granted.

Prior to trial, Diamondback filed a Motion for Claim Construction (Doc. 28) pursuant to Markman v. Westview Instruments, Inc., 517 U.S. 370 (1996), stating that the parties disagreed on how the term "half-cocked position" should be interpreted as used in the '914 Patent. Diamondback argued that the Court should define "half-cocked position" as the "midpoint position of the travel of the striker, with partial striker spring compression." (Doc. 28 at 10). The Defendants objected to both aspects of Diamondback's proposed construction and argued that "half-cocked" required no definition because its meaning was plain from within the claim itself.

The Court heard argument on Diamondback's Markman motion and ultimately rejected both facets of Diamondback's proposed limiting construction of "half-cocked." (Am. Claim Construction Order, Doc. 121). First, the Court found Diamondback's "midpoint position of the travel of the striker" argument to be completely devoid of merit, finding no intrinsic or extrinsic evidentiary support for such a limitation and noting that Diamondback's expert provided no basis for his conclusory assertion as to a "midpoint position." The Court noted evidence of historical use of the term "half-cocked" in the firearms industry; that use

did not support a "midpoint position" limitation. Instead, the term has been used to "refer[]
generally to a position of either the hammer or striker between the uncocked/firing position
and the fully cocked position where they are not in contact with the primer of a cartridge in
the chamber.'" (Id. at 9 (quoting J.B. Wood Decl., Ex. B to Doc. 34, at 3)). The Court thus
declined to read into "half-cocked position" a requirement that the striker be in the midpoint
position of its travel. (Id. at 10).

        Second, the Court rejected Diamondback's argument that "half-cocked position"
should be construed as including the limitation "with partial striker spring compression,"
finding no support for such a limitation in the claims, the specification, the prosecution
history, or extrinsic evidence. The Court also rejected Diamondback's contention that failing
to assign a definition to "half-cocked position" would render it redundant to the phrase that
comes after it the first time it appears in the claims—"intermediate said fully-cocked position
and said striking position." (Id. at 18). The Court noted that as described in the patent, the
"half-cocked position is distinguished from the uncocked position by its location intermediate
the fully-cocked position and the striking position as well as by the fact that the cocking and
releasing element maintains the striker in the half-cocked position." (Id.). The Court thus
concluded that "[n]o redundancy or meaninglessness results from not defining 'half-cocked
position' beyond how it is already defined by the claim language itself." (Id.). The Court also
noted Federal Circuit precedent providing that claim terms need be construed "'only to the
extent necessary to resolve the controversy." (Id. (quoting Vivid Techs., Inc. v. Am. Sci. &
Eng'g, Inc., 200 F.3d 795, 803 (Fed. Cir. 1999))). Diamondback now requests a new trial
based on the Court's supposed "failure to construe the claim term." (Doc. 202 at 3).

In support of its contention that the Court "failed to construe" the term "half-cocked," Diamondback relies on the Federal Circuit's decision in O2 Micro International Limited v. Beyond Innovation Technology Co., Ltd., 521 F.3d 1351 (Fed. Cir. 2008). In that case, the appellants argued that the district court failed to construe the patent term "only if" where the parties disputed whether that term allowed for exceptions. The appellants requested a construction of "only if" that specified that "only if" had no exceptions, but the district court concluded that the term "needs no construction" and did not address the parties' disagreement over whether exceptions were allowed. 521 F.3d at 1361.

On appeal, the Federal Circuit concluded that "[i]n deciding that ' "only if" needs no construction' because the term has a 'well-understood definition,' the district court failed to resolve the parties' dispute because the parties disputed not the meaning of the words themselves, but the scope that should be encompassed by this claim language." Id. (emphasis removed). The appellate court noted that "[a] determination that a claim term 'needs no construction' or has the 'plain and ordinary meaning' may be inadequate when a term has more than one 'ordinary' meaning or when reliance on a term's 'ordinary' meaning does not resolve the parties' dispute." Id. In O2 Micro, the parties presented their arguments to the jury about what the term meant, and the Federal Circuit found that this was improper. Id. at 1362.

This Court is not persuaded that O2 Micro establishes error in the instant case with regard to the Court's ruling on Diamondback's motion for claim construction. This Court did not—like the O2 Micro district court—decline to pass on the question presented by the parties. Instead, the Court expressly rejected Diamondback's proposal to read two

limitations into the term "half-cocked." This Court ruled on the question presented as to whether "half-cocked position" required any amount of spring compression or that the striker be in the midpoint of its path of travel, which was the extent of the claim construction controversy that was presented to the Court. The Court also stated in the Markman Order that there was no need to define "half-cocked position" beyond how it was already defined by the claim language itself. (Doc. 121 at 18).

This case is more akin to Finjan, Inc. v. Secure Computing Corp., 626 F.3d 1197 (Fed. Cir. 2010), in which the Federal Circuit distinguished its O2 Micro decision. In Finjan, the appellants argued that the trial court erred by failing to construe the patent term "addressed to a client" where the defendants proposed defining "addressed" as "containing the IP address of the client computer" and "client" as "the computer from which the user is making a request" while the plaintiff argued "that the phrase has an 'ordinary meaning within the context of the claims.'" 626 F.3d at 1206. "The district court construed 'addressed to a client' as having 'its plain and ordinary meaning,' but also observed that 'the defendant's proposed construction would unjustifiably narrow the term's broad scope, which was not explicitly limited or redefined by the specification.'" Id. In the jury instructions, "[t]he jury did not receive a construction of 'addressed to a client' but was told to 'give the rest of the words in the claims their ordinary meaning.'" Id. at 1206-07.

The Finjan defendants argued on appeal that "the district court shirked its responsibility to construe a disputed claim term by adopting 'plain and ordinary meaning,'" allegedly "violating the principles of" O2 Micro. Id. at 1207. The Federal Circuit, however, found that "[n]o such error happened" in Finjan because "[u]nlike O2 Micro, where the court

failed to resolve the parties' quarrel, the district court rejected Defendants' construction, which required an IP address" and "[l]ater, at trial, it prevented the jury from reconstruing the term by stopping Defendants' expert . . . from repeating to the jury that the asserted claims require an IP address." Id. The Federal Circuit concluded that "[i]n this situation, the district court was not obligated to provide additional guidance to the jury" and noted that even on appeal the defendants had not proposed an alternative construction of "addressed to a client," nor had they explained "how a different definition would negate infringement." Id. The court found that the defendants were not entitled to a new trial based on the alleged failure to construe the claim term. Id.

Similarly, in the case at bar the Court did resolve the claim construction dispute that was presented to it in Diamondback's Markman motion. The Court rejected both limitations proposed by Diamondback and prohibited Diamondback from arguing its rejected claim limitations to the jury. Although Diamondback now takes issue with being "foreclosed . . . from arguing its rejected claim definition," (Doc. 202 at 3), it would have been improper for Diamondback to have done so. And, although Diamondback asserts that the jury was "bombarded with different definitions and descriptions of the 'half-cocked' position by Defendants," (id. at 4), no such bombardment took place, and certainly not from Defendants. Defendants did not argue or present evidence of a definition of "half-cocked position" inconsistent with the Court's claim construction ruling. Indeed, throughout the trial, Defendants—not Diamondback—repeatedly expressed concern about the jury hearing testimony about the meaning of "half-cocked," while Diamondback, on the other hand, asserted that the issue was "fair game" and presented deposition testimony about usage fo

the term.   Moreover, Defendants proposed a limiting jury instruction regarding the previously-rejected limitations that Diamondback had proposed pretrial, but Diamondback objected to that instruction and it was not given. The jury was not presented with the parties' competing definitions as was the jury in O2 Micro.

Diamondback has not established entitlement to a new trial based on the Court's handling of the "half-cocked position" issue.  It is clear that Diamondback disagrees with the Court's rejection of its Markman proposals, but that disagreement does not support the instant motion.

### B.  Indefiniteness

Next, Diamondback argues that the asserted patent claims are invalid as indefinite because two of the claim terms are not amenable to construction.  The Court is not persuaded.  Because the asserted claims reasonably apprise those skilled in the art of their scope, they are not indefinite.

Subsection (b) of 35 U.S.C. § 112 requires that patent claims "particularly point[] out and distinctly claim[] the subject matter which the inventor or a joint inventor regards as the invention."  The purpose of this definiteness requirement, as it is called, "is to ensure that the claims delineate the scope of the invention using language that adequately notifies the public of the patentee's right to exclude."  Datamize, LLC v. Plumtree Software, Inc., 417 F.3d 1342, 1347 (Fed. Cir. 2005). "The definiteness requirement, however, does not compel absolute clarity.  Only claims 'not amenable to construction' or 'insolubly ambiguous' are indefinite."  Id.  "A claim is considered indefinite if it does not reasonably apprise those skilled in the art of its scope."  IPXL Holdings, L.L.C. v. Amazon.com, Inc., 430 F.3d 1377,

1383-84 (Fed. Cir. 2005).

"To prove indefiniteness, 'an accused infringer must demonstrate by clear and convincing evidence that one skilled in the relevant art could not discern the boundaries of the claim based on the claim language, the specification, the prosecution history, and the knowledge in the relevant art.'" Teva Pharm. USA, Inc. v. Sandoz, Inc., 723 F.3d 1363, 1368 (Fed. Cir. 2013) (quoting Wellman, Inc. v. Eastman Chem. Co., 642 F.3d 1355, 1366 (Fed. Cir. 2011)). "Indefiniteness is a question of law . . . ." Id.

### 1. "Half-cocked"

Diamondback contends that "half-cocked" is not amenable to construction because it does not have a "common meaning" among those of ordinary skill in the art. However, as discussed earlier in this Order and in the claim construction Order, the term is generally understood to mean a position between the uncocked and fully-cocked positions, does not require that the striker be at the midpoint of its path of travel, and does not necessarily require partial striker spring compression. Additionally, the '914 Patent explains that the striker is maintained in the half-cocked position by the cocking and releasing element.

Diamondback asserts that in Defendants' view the "half-cocked position" "can be anywhere intermediate the fully cocked and striking position[s]" and that this approach "provide[s] no clarity" and is redundant to other limitations. (Doc. 202 at 9). The Court already rejected both of these arguments in the claim construction Order. The "half-cocked position" is adequately described relative to other positions of the striker and as to the state that the firearm is in when the striker is in that position. A person skilled in the art is reasonably apprised of the scope of the claims, and the inventor's use of the term "half-

-11-

cocked position" in the '914 Patent does not render the asserted claims indefinite.

2. "Second position"

Diamondback also contends that the term "second position" is not amenable to construction. Diamondback argues that during trial, Defendants' expert, Seth Bredbury, "offered a definition of the term 'second position' for the first time in this litigation" while "attempting to distinguish the '914 Patent from prior art." (Doc. 202 at 9). According to Diamondback, the definition of "second position" "became relevant when Defendants argued that the Dunn Patent[2] only discloses a second position (as opposed to both first and second positions)." (Id.). Diamondback argues that "there are at least two equally plausible interpretations of the second position" and that the term "second position" is "insolubly ambiguous." (Id.). The Court is not persuaded.

Prior to trial, the only claim term as to which construction was requested by any party was "half-cocked position," so "second position" has not previously been discussed by the Court.[3] By way of background, the word "position" appears numerous times in the claims of the '914 Patent, and different claim elements have different possible positions.[4] Diamondback's "second position" argument pertains to the position of the cocking and

---

[2]U.S. Patent No. 5,157,209.

[3]Diamondback raised the "second position" indefiniteness issue—very generally—only after Defendants rested their case. (See Trial Tr. Day 3, Doc. 193, at 163).

[4]The slide moves between a "forward position" and a "retracted position"; the striker moves from a "striking position" to a "half-cocked position" to a "fully-cocked position"; the trigger is moveable from an "inactive position" to a "firing position"; and the cocking and releasing element is moved from its "first position" to its "second position" by the trigger assembly.

releasing element.[5]

Diamondback's assertion that Mr. Bredbury "offered" a definition of "second position" for the first time during trial while attempting to distinguish the '914 Patent from prior art is misleading. In the testimony cited by Diamondback in its motion, Mr. Bredbury described the second position in response to general questioning by Diamondback's counsel about the positions of various elements, not specific questioning regarding the Dunn Patent or any prior art.[6] (Trial Tr. Day 3, Doc. 193, at 110-11).

Moreover, Diamondback's assertion as to the definition "becoming relevant" with regard to whether the Dunn Patent discloses a second position is surprising. As Diamondback emphasizes in another part of its motion, and as Diamondback made clear at trial during its cross-examination of Mr. Bredbury, the presence or absence of a second position in the Dunn Patent is inconsequential with regard to the issue of obviousness—the only issue in this case on which the Dunn Patent could possibly be relevant—because it is undisputed that the "second position," or more specifically, a cocking and releasing element that moves from first to second positions, is disclosed by the Glock Patent.[7] (See Doc. 202

---

[5]In their response memorandum on this issue, Defendants focus on the position of the striker rather than on the position of the cocking and releasing element. (See Doc. 213 at 7). It is clear from the '914 Patent, Diamondback's argument, and the trial testimony cited by Diamondback, however, that it is the position of the cocking and releasing element—not the striker—that is at issue in this portion of Diamondback's motion. Defendants' memorandum is thus not helpful to the Court on this point.

[6]At trial, Mr. Bredbury gave testimony regarding both invalidity and infringement.

[7]U.S. Patent No. 4,539,889.

at 16; Trial Tr. Day 3 at 138-39).[8]   The Dunn Patent thus is not necessary to the establishment of disclosure of that element; in the obviousness analysis, the Dunn Patent is only needed for disclosure of the "disconnecting means" element of Claims 1 through 6 and 8.  (See Doc. 202 at 16).

In any event, Diamondback now contends that the asserted claims are indefinite because "there are at least two equally plausible interpretations of" "second position."  (Id. at 9).  One, says Diamondback, is "when the cocking and releasing element has moved the striker to the fully cocked position," (id.), which is what Mr. Bredbury testified to at the end of the testimony cited by Diamondback when he described the second position as "that in which [the cocking and releasing element] is just about to release the firing element," (Trial Tr. Day 3 at 111).  The other possibility, says Diamondback, is that the second position is "once the striker has been released from the fully-cocked position."  (Doc. 202 at 10).  Diamondback avers that "[c]hoosing between these two options is little more than a coin flip," that there is "no evidence making one construction more or less likely," and that therefore "construction of the second position is insolu[]bly ambiguous."  (Id.).

Diamondback's assertion of insoluble ambiguity is rejected.  The term "second position" is not indefinite merely because Diamondback has identified two possible definitions for it.  "[B]ecause claim construction frequently poses difficult questions over which reasonable minds may disagree, proof of indefiniteness must meet 'an exacting

---

[8]Furthermore, Diamondback has not argued that the DB380 does not have a cocking and releasing element with first and second positions, and Diamondback's expert did not challenge the presence of that claim element in his expert report.  (See Nixon Expert Report, Doc. 75-4, at 36-37).

standard.'"  Haemonetics Corp. v. Baxter Healthcare Corp., 607 F.3d 776, 783 (Fed. Cir. 2010). And, "[a] claim is not indefinite merely because parties disagree concerning its construction." Id.

The meaning of the term "second position" is discernible from the '914 Patent. The asserted claims of the '914 Patent describe the cocking and releasing element as being moveable between first and second positions, and during the firing of the gun the cocking and releasing element is moved from its first to its second position by the trigger assembly when the trigger is pulled. The claims also describe the striker as releasable from its fully-cocked position, and the cocking and releasing element is what releases it. The specification also describes the cocking and releasing element "mov[ing] a striker rearwardly . . . to a fully-cocked position and releas[ing] the striker to move forwardly." ('914 Patent col.2 ll.17-20; see also id. ll.63-66 (describing the cam moving the striker from its half-cocked position to a fully-cocked position, "after which the cam releases the striker to move forward to a striking position" (internal patent element labeling removed))). As described in the '914 Patent, the cocking and releasing element is moved by the trigger assembly at least to the point where the striker has been released. The second position therefore must be a position at which the cocking and releasing element has released the striker.[9]  Diamondback's assertion that "second position" is insolubly ambiguous is incorrect, and thus its argument of indefiniteness on this basis fails as well.

---

[9]The difference between the position of the cocking and releasing element when it is holding the striker in its "fully-cocked position" and when it has released the striker are very close in time and distance—"fully-cocked" ends where "release" begins.

C.  Anticipation of Claim 12

In its third argument, Diamondback asserts that Claim 12 of the '914 Patent is invalid as anticipated by the Glock Patent and that the Court should grant it judgment as a matter of law on this issue despite the jury's finding of no anticipation.  Diamondback is incorrect.

To establish anticipation of Claim 12 under 35 U.S.C. § 102, Diamondback must show by clear and convincing evidence the presence of every limitation of Claim 12 in a single prior art reference.  Crown Packaging Tech., Inc. v. Ball Metal Beverage Container Corp., 635 F.3d 1373, 1383 (Fed. Cir. 2011).  "Anticipation under 35 U.S.C. § 102 is a question of fact."  ActiveVideo Networks, Inc. v. Verizon Comm'cns, Inc., 694 F.3d 1312, 1327 (Fed. Cir. 2012).  In order to be entitled to judgment as a matter of law in its favor on the issue of anticipation in the face of the jury's contrary verdict, Diamondback must show that, viewing the evidence in the light most favorable to the Defendants, the non-moving parties, no reasonable jury could find that Claim 12 was not anticipated.  Diamondback has not met this burden.

At trial, the parties and their experts disagreed on whether the Glock Patent disclosed the "second biasing means" element of Claim 12.  The parties presented evidence to the jury regarding the presence or absence of the "second biasing means" in the Glock Patent, and the Court cannot conclude that no reasonable jury could find that the second biasing means was not present in the Glock Patent.

The "second biasing means" element reads in full:  "second biasing means for urging said cocking and releasing element towards its first position."  ('914 Patent col.7 ll.23-24).  The parties' dispute regarding the "second biasing means" element pertains to whether there

-16-

is a second biasing means in the Glock Patent that urges the cocking and releasing element "towards its first position." Diamondback's expert, John Nixon, testified that in the Glock Patent, a leaf spring (labeled 106 in the Glock Patent) pushes the lever—the cocking and releasing element in the Glock Patent—"up" and holds it against the striker. (Trial Tr. Day 2, Doc. 192, at 62, 81). Mr. Nixon explained that "[f]or a safe engagement, [the lever] needs to be pushed upward so that you have a good positive engagement," and that because of that "upward" urging, that leaf spring 106 urges the lever "towards its first position." (Id. at 81). On cross-examination, Mr. Nixon testified that "106 does push it up and maintains it in its first position **from a vertical perspective**." (Id. at 142) (emphasis added).

Defendants' expert, Mr. Bredbury, testified that the Glock Patent does not disclose a "second biasing means for urging said cocking and releasing element towards its first position." Mr. Bredbury explained that the lever in the Glock Patent has two motions—back and forth, and up and down. (Trial Tr. Day 3 at 57). Mr. Bredbury did not agree with Mr. Nixon regarding the leaf spring 106; he explained that that spring "forces the lever back up" after it has been pushed down and that the lever could be "up" whether it was in its first position or its second position. (Id. at 59). Mr. Bredbury explained that the spring 106 in the Glock Patent "does nothing other than move [the lever] up and down . . . [, w]hich has nothing to do with first or second position." (Id. at 159).

In sum, both sides presented evidence regarding the presence or absence of the "second biasing means" in the Glock Patent. Diamondback has not established that no reasonable jury could find that the "second biasing means" was not disclosed by the Glock Patent, and its contention that it is entitled to judgment as a matter of law on the issue of

disclosure of the "second biasing means" is therefore flawed.

Diamondback also argues with regard to anticipation that "[i]n an effort to craft a theory to avoid anticipation," Mr. Bredbury offered new definitions of "first position" during cross-examination. (Doc. 202 at 11). Diamondback contends that Mr. Bredbury's new, "special" definitions of "first position" are "the only basis" for Mr. Bredbury's opinion that Claim 12 is not anticipated by the Glock Patent. (Id. at 12). These assertions are also without merit.

In the testimony cited by Diamondback in support of its contention that Mr. Bredbury "offered new definitions" at trial, Diamondback's counsel asked Mr. Bredbury what and where the "first position" is. (Trial Tr. Day 3 at 110-11). In response, Mr. Bredbury described where that position is and explained why the spring 106 in the Glock Patent does not urge the lever toward its first position but instead urges it "along the surface that forms the first position." (Id. at 110-11, 135). Diamondback claims that Mr. Bredbury did not offer these "definitions" prior to trial, that Diamondback is the victim of "trial by ambush," and that Defendants should have presented "first position" as a claim construction issue before trial.

Mr. Bredbury explained at trial that the spring 106 in the Glock Patent does not urge the lever towards the first position because it only urges the lever "upwards," just as it does when the lever is in its second position. Mr. Bredbury's explanations of the surfaces on the Glock mechanism and why the spring does not urge the lever towards the first position do not create issues of "new and undisclosed claim construction" regarding the '914 Patent as

argued by Diamondback.[10]

In sum, the jury's finding that Claim 12 is not invalid as anticipated by the Glock Patent will not be disturbed.

### D. Obviousness of Claims 1 through 6, 8, and 12

Diamondback argued at trial that Claims 1 through 6, 8, and 12 of the '914 Patent are invalid as obvious in light of the Glock Patent combined with the Dunn Patent. The jury found that Diamondback failed to prove by clear and convincing evidence that any of these claims was invalid as obvious. Diamondback now contends that it should be granted judgment as a matter of law on the issue of the obviousness of each of these claims, but this argument fails.

---

[10]Diamondback also suggests that it "had no opportunity to learn of or test Mr. Bredbury's opinion on this issue before trial, as Mr. Bredbury conceded that this element [the second biasing means] is found in the Glock Patent, only denying it existed after discovery." (Doc. 202 at 12 (emphasis and internal citation to Bredbury's deposition removed)). This assertion is not well-taken, and it has previously been addressed by the Court.

In his expert report dated April 6, 2012, Mr. Bredbury disputed the disclosure of the "second biasing means" by the Glock Patent and explained his disagreement with Mr. Nixon on that point. (Bredbury Expert Report, Doc. 92-1, at 24). At his deposition on May 4, 2012, Mr. Bredbury—in an obvious mistake—answered "yes" when asked by Diamondback's counsel whether the second biasing means was disclosed by the Glock Patent. (Bredbury Dep., Doc. 75-5, at 12). Mr. Bredbury attempted to correct this error in his deposition testimony through an errata sheet, but Diamondback successfully moved to strike the errata sheet. (Docs. 78 & 90). Diamondback then sought summary judgment in its favor on the issue of anticipation, arguing that both sides' experts agreed that all elements, including the second biasing means, were disclosed by the Glock Patent. (See Doc. 75 at 2-3). The Court rejected this contention, however, noting that in his expert report—which preceded his deposition testimony—Mr. Bredbury clearly disagreed with Mr. Nixon on this issue and that his expert report was still of record. (See Order on Mot. Summ. J. as to Invalidity, Doc. 113, at 13). Diamondback's efforts to resurrect the issue regarding Mr. Bredbury's alleged "concession" as to "second biasing means" are unavailing, as are its arguments regarding being "ambushed" by his trial testimony.

A patent claim is invalid as obvious "if the differences between the [patented] subject matter and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains."  35 U.S.C. § 103(a) (1996).[11]  "A party seeking to invalidate a patent on the basis of obviousness must 'demonstrate by clear and convincing evidence that a skilled artisan would have been motivated to combine the teachings of the prior art references to achieve the claimed invention, and that the skilled artisan would have had a reasonable expectation of success in doing so.'"  Kinetic Concepts, Inc. v. Smith & Nephew, Inc., 688 F.3d 1342, 1360 (Fed. Cir. 2012) (quoting Procter & Gamble Co. v. Teva Pharm. USA, Inc., 566 F.3d 989, 994 (Fed. Cir. 2009) (further internal quotation omitted).

"Obviousness under § 103 is a question of law based on underlying factual determinations."  Genetics Inst., LLC v. Novartis Vaccines & Diagnostics, Inc., 655 F.3d 1291, 1302 (Fed. Cir. 2011).  The questions of what a prior art reference teaches and whether there is a reason to combine references are questions of fact.  TriMed, Inc. v. Stryker Corp., 608 F.3d 1333, 1341 (Fed. Cir. 2010); Kinetic Concepts, 688 F.3d at 1367.

Like Claim 12, Claims 1 through 6 and 8 all include a "second biasing means," and as discussed with regard to anticipation of Claim 12, the evidence presented at trial was conflicting regarding whether the Glock Patent disclosed that element, and Diamondback did not present clear and convincing evidence of that disclosure.  This in and of itself is sufficient to dispose of Diamondback's obviousness argument as well.

---

[11]The wording of this subsection has been amended since the issuance of the '914 patent in 1996.

Additionally, the evidence at trial was conflicting regarding whether there was a reason to combine the elements, even assuming that all elements of these claims were disclosed by the Glock Patent and the Dunn Patent together.  The Court does not find that there is only one reasonable conclusion to be drawn from the evidence or that such conclusion would be contrary to that reached by the jury in this case.  Diamondback's motion for judgment as a matter of law is denied on the issue of obviousness as well.

E.  Infringement Evidence

In its verdict, the jury found that Defendants had proved by a preponderance of the evidence that Diamondback has infringed Claims 1 through 6, 8, and 12 of the '914 Patent. Diamondback now argues that Defendants did not present sufficient evidence of infringement to support the jury's verdict and that judgment as a matter of law should be entered in its favor on this issue.  This argument is also without merit.

"To prove infringement, a [patent owner] must prove the presence of each and every claim element or its equivalent in the accused method or device."  Star Scientific, Inc. v. R.J. Reynolds Tobacco Co., 655 F.3d 1364, 1378 (Fed. Cir. 2011).  "Entry of JMOL is appropriate only if the jury's verdict is unsupported by substantial evidence or premised on incorrect legal standards."  Hearing Components, Inc. v. Shure Inc., 600 F.3d 1357, 1369 (Fed. Cir. 2010).  Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Teleflex, Inc. v. Ficosa N. Am. Corp., 299 F.3d 1313, 1323-24 (Fed. Cir. 2002).

Diamondback's infringement evidence argument pertains to the element—present in each of the asserted claims of the '914 Patent—that the cocking and releasing element

-21-

of the firearm "maintains" the striker in the "half-cocked position." Diamondback contends that "the evidence at trial confirmed that at least some of [Diamondback's accused firearms] have a gap between the striker and sear in the firing mechanism, allowing the position of the striker to more or less 'float.'" (Doc. 202 at 21). Diamondback asserts that this "float" or "gap" is inconsistent with the requirement of the asserted patent claims that the striker be "maintained" in the "half-cocked position."

The jury's verdict of infringement will not be disturbed. In extensive trial testimony, Defendants' expert, Mr. Bredbury, explained and demonstrated to the jury where each element of the '914 Patent was present in Diamondback's DB380 firearm. Mr. Bredbury explained that the "maintaining" element was met regardless of whether there is "float" in the subject gun. Moreover, as indicated even by the words used in Diamondback's own motion—that "at least some of the DB380s" have float—some of the DB380s do not have such float in any event. Indeed, Diamondback's CEO, Brad Thomas, who designed the DB380, testified at trial that the DB380 was originally "designed to have float," but changes made over time "have impacted the amount of float" and "[s]ome of the changes made it where it is less likely to have float or more likely to have float." (Trial Tr. Day 1, Doc. 191, at 173-74). Thomas also testified that the current DB380s do not have float even in the design. (Trial Tr. Day 2 at 16).

In sum, Defendants presented evidence that the Diamondback's guns infringe regardless of whether they have float. Moreover, Diamondback has acknowledged, and the trial evidence showed, that at least some of the manufactured DB380s have no float, and those firearms would infringe even if "float" made a difference as to infringement.

-22-

Substantial evidence supports the jury's finding of infringement, and Diamondback is not entitled to judgment as a matter of law on this issue.

F.  Evidence of Ownership

Diamondback next argues that Defendants failed to present evidence of ownership of the '914 Patent and that they thus lack standing to assert infringement of the patent.  This contention is without merit.

Although Diamondback avers in its motion that "[n]either Defendant offered evidence or testimony to resolve the question of ownership and to establish . . . who actually owns the '914 Patent," (Doc. 202 at 22), Defendants correctly respond that Defendant Moon is listed on the '914 Patent as the sole inventor; that Mr. Moon testified at trial that he is the owner of the '914 Patent, (Trial Tr. Day 2 at 175-76); and that Mr. Moon also testified at trial that since being awarded the patent he has not licensed it to anyone other than his own company, (id. at 182).  Diamondback's assertion as to a lack of evidence of ownership is rejected.

G.  Indefinite Hybrid Claims

Diamondback's final argument is that the asserted patent claims are "indefinite hybrid claims" because they "includ[e] limitations to both an apparatus and a method step in the same claim." (Doc. 202 at 23).  Diamondback relies on IPXL Holdings, LLC v. Amazon.com, Inc., 430 F.3d 1377, 1383-84 (Fed. Cir. 2005), in which the Federal Circuit held that where a single patent claim covers both a system and a method for using that system, the claim is invalid under paragraph two of 35 U.S.C. § 112.  Also citing IPXL, Defendants acknowledge that "[c]laims that recite two separate statutory classes of invention are

impermissible because they are indefinite," (Doc. 213 at 19), but they deny that the asserted claims of the '914 Patent recite two such separate classes. The Court is not persuaded that the asserted claims are indefinite hybrid claims.

Diamondback's argument on this point pertains in part to the term "half-cocked." Diamondback asserts that in Defendants' view, "'half-cocked' is not an identifiable location[] but instead a mixture of apparatus and method limitations." (Doc. 202 at 24).  As noted by Defendants, Diamondback's argument does not focus on the claims themselves or even on other parts of the '914 Patent.  Instead, Diamondback cites extrinsic evidence that was presented during claim construction and trial testimony of Defendants' expert, Mr. Bredbury.

Diamondback's argument that "half-cocked" is not an identifiable location is rejected. The "half-cocked position" is, as described in the '914 Patent and as explained by Mr. Bredbury at trial, a position between the fully-cocked position and the striking position in which the striker is maintained by the cocking and releasing element.  The striker gets to the half-cocked position through manual racking of the slide or through firing of the gun, which drives the slide back.  (Trial Tr. Day 3 at 37 (Bredbury Test.)).  The fact that Mr. Bredbury used descriptions such as "how you get there" and "when you pull the slide back and release it" in explaining to the jury the way the gun operates does not mean that "half-cocked" is a mixture of apparatus and method limitations.  Nor do the descriptions of historical use of the term "half-cocked" that were submitted and considered during claim construction render the claims a hybrid of apparatus and method.

In addition to "half-cocked," Diamondback also asserts that "cocking and releasing element" is a mixture of method and apparatus, citing Mr. Bredbury's affirmative answer on

cross-examination to a question about that element "perform[ing] some activity, some method." (Doc. 202 at 24 (citing Trial Tr. Day 3 at 106)).  However, Diamondback does not cite the entire line of questioning, and in any event the Court does not impart to Mr. Bredbury's answer the legal significance suggested by Diamondback.  Mr. Bredbury explained that he understood how the cocking and releasing element functions and that he did not know whether it was legally considered a "method element."[12]  Diamondback's contention that the cocking and releasing element is a mixture of method and apparatus limitations fails.

Diamondback also cites testimony from Mr. Moon regarding the patent claims containing "methods and physical components." (Trial Tr. Day 2[13] at 192, cited in Doc. 202

---

[12]The questions and answers, beginning with the three lines cited by Diamondback, were as follows:

Q [by Diamondback's counsel]: So that definition of cocking and releasing element requires it to perform some activity, some method?
A [by Mr. Bredbury]: Yes.
Q: Okay. So it's a method element within that particular claim 12, right?
A: As I stated earlier, that's not obvious to me, clear to me, legally. I know what it does.
Q: But it has —
A: I know how it functions.
Q: But the element has to have movement and some sort of method to it?
A: Yes, it has to have movement.
Q: And if it's not moving, does it fall within the claims?
A: If it's not moving at some instant in time, doesn't mean it doesn't infringe. If it's capable of making this motion and performing this function, then it infringes.

(Trial Tr. Day 3 at 106).

[13]In its motion, Diamondback actually cites the transcript of the third day of trial. However, Mr. Moon testified on the second day of trial, not the third.

-25-

at 24).  Again, however, this lay testimony does not prove Diamondback's indefiniteness argument.  Finally, Diamondback cites Mr. Bredbury's testimony regarding "float" in the DB380 as support for its "hybrid claim" argument.  (Id. (citing Trial Tr. Day 3 at 123-24)).  But, Diamondback's reliance on this testimony about the alleged infringing product does not establish that the claims of the '914 Patent are indefinite hybrid claims.

In sum, indefiniteness is a question of law and Diamondback has not persuaded the Court that the asserted claims of the '914 Patent are indefinite hybrid claims.

### IV.  Conclusion

It is **ORDERED** and **ADJUDGED** as follows:

1. The Renewed Motion for Judgment as a Matter of Law or Alternatively for a New Trial (Doc. 202) filed by Plaintiff, Diamondback Firearms, LLC, is **DENIED** in all respects.

2. As stated at the hearing on October 10, 2013, and in accordance with Federal Rule of Civil Procedure 58, an amended judgment will be entered based on the Court's ruling during that hearing granting in part and denying in part Defendants' Motion to Alter or Amend Final Judgment (Doc. 198).  The Clerk is directed to enter an Amended Judgment in the form attached to this Order.

**DONE** and **ORDERED** in Orlando, Florida this 6th day of February, 2014.

JOHN ANTOON II
United States District Judge

Copies furnished to:
Counsel of Record

-26-